**SABRINA P. SHROFF**
ATTORNEY

80 BROAD STREET
19TH FLOOR
NEW YORK, NEW YORK 10004
TEL: (646) 763-1490

# MEMO ENDORSED

April 18, 2023

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/20/2023

**ECF**
Hon. ~~Valeri~~ Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:   **United States v. Davis,** ~~S7 15 Cr. 588~~ S9 21-CR-603 **(VEC)**

Dear Judge Caproni:

    I write pursuant to Rule 3(A) of the Court's Individual Practice Rules. I write to seek the Court's permission to file Exhibit E (Brady Disclosures made in this case), in a redacted form as I am bound by the Court's prior rulings on this issue. The portions for which redaction is sought are highlighted in yellow for the Court's perusal. Pursuant to the same rules, I seek the Court's permission to withhold from public filing Exbibit G, a report from a psychologist as it discusses in detail Mr. Davis's limited cognitive abilities and other personal details.

    Exhibit F is a public document and will be filed on ECF.
    I thank the Court for its time and consideration of this request.

Respectfully submitted,

/s/Sabrina Shroff
Counsel to Ronald Glen Davis

---

Application GRANTED.  By **April 21, 2023**, Mr. Davis must also file on ECF a letter motion to redact the exhibits filed in conjunction with Mr. Davis's motion *in limine* at Dkt. 917 pursuant to Rule 3 of the Undersigned's Individual Practices in Criminal Cases.

SO ORDERED.

*[signature]*   04/20/2023

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

Case 1:21-cr-00603-VEC Document 934-1 Filed 04/21/23 Page 2 of 18
Case 1:21-cr-00603-VEC Document 937-1 Filed 04/20/23 Page 2 of 17

SHROFF EXHIBIT E
REDACTED


SHROFF EXHIBIT E
REDACTED



**U.S. Department of Justice**

Received by GLG
May 2, 2022

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 1, 2022

To: All Counsel

    **Re:**    *United States v. Williams, et al.* 21 Cr. 603 (VEC)

Dear Counsel:

    The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the information below.

    On or about August 7, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Dr. Patrick Khaziran of Advanced Chiropractic and Rehab Center ("ACRC"). The case team has since learned that during the August 7, 2019 interview, Dr. Khaziran made the following statements, in substance and in part: (i) Dr. Khaziran routinely treats current and former athletes (including from the NBA) and their families; (ii) Dr. Khaziran charges $1,000/day regardless of how long a patient is at ACRC or the number of services rendered to the patient, although on occasion, if a patient leaves the facility early, charges may be less than $1,000; (iii) Dr. Khaziran treated 52 of 60 NBA players, on a list of players provided to him by the interviewers, and does not recall treating the following players: Alan Anderson, Anthony (Tony) Allen, ▇▇▇▇▇▇▇▇ Charles Watson Jr., Ronald Glen Davis (may have seen at some time), Shannon Brown (does not believe he is a patient but name is familiar), Sebastian Telfair (not a patient but treated his wife); and (iv) Dr. Khaziran reviewed letters of medical necessity and suggested that there were issues with the letters—insofar as the signatures did not appear to be authentic and the language contained in the letters was unusual—and could not confirm that they were his letters.

    On or about December 9, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Anthony ("Tony") Allen. The case team has since learned that during the December 9, 2019 interview, Allen made the following statements, in substance and in part: (i) Allen received a letter seeking further verification; and (ii) Allen would do what he can to repay the money. According to the non-law enforcement individuals who conducted this interview, this interview was conducted over Skype and lasted about ten minutes or less at night.

    On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Ronald Glen Davis. The case team has since learned that during the December 10, 2019 interview, Davis made the following statements, in substance and in part: (i) Davis did not misuse his healthcare reimbursement account; (ii) Davis had some concern that his identity had been stolen; (iii) Davis

did not submit reimbursement claims for "Dr. Pat" and Dr. Wahab; and (iv) Davis did not submit a letter of medical necessity. According to the non-law enforcement individuals who conducted this interview, this interview was conducted while Davis was in his car on the phone and was somewhat distracted.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Charles ("C.J.") Watson Jr.. This case team has since learned that during the December 10, 2019 interview, Watson Jr. made the following statements, in substance and in part: (i) Watson Jr. did not engage in any wrongdoing regarding his healthcare reimbursement account; (ii) Watson Jr. was aware of a conversation at the Big 3 tournament regarding being entitled to funds in individuals' HRA funds; (iii) Watson Jr. submitted reimbursements; and (iv) Watson Jr. he received services in Seattle.

On or about January 19, 2022, the National Basketball Association Players' Health and Welfare Benefit Plan (the "Plan"), through counsel, informed the case team that the Plan takes "no position" as to whether or not the Plan is a victim of the conduct charged in the Indictment in this case.

On January 5, 2022, the discovery coordinator questioned the Government, with respect to the December 8, 2021 production, why certain .eml files in folder "02. 2703(d)\Apple\20 MAG 6032" (the "Folder") contain no subject or email body. The .eml files contained with the Folder were produced to the defendants in the form they were received from Apple. Further, because the Folder contains returns from an order issued pursuant to 18 U.S.C. § 2703(d), they should not contain content. When a paralegal working on this case examined the Folder in response to the discovery coordinator's January 5 query, they observed that at least two of the .eml files in the Folder appeared to have content. To the extent that .eml files in the Folder contain content information, the Government did not rely on that content in investigating and charging this case, and will not rely on any such content information moving forward.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

    Very truly yours,

    DAMIAN WILLIAMS
    United States Attorney

by:     /s/
    Kristy J. Greenberg
    Ryan B. Finkel
    Assistant United States Attorneys
    (212) 637-2469/6612

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 3, 2022

CDA note: This supplemental letter was originally received on 2/1/22. This revised letter was received on 2/3/22 to correct a typo. It includes a response to the CDA's inquiry regarding blank EML files located in Production 12.8.21.

To: All Counsel

Re:   *United States v. Williams, et al.* 21 Cr. 603 (VEC)

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the information below.

On or about August 7, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Dr. Patrick Khaziran of Advanced Chiropractic and Rehab Center ("ACRC"). The case team has since learned that during the August 7, 2019 interview, Dr. Khaziran made the following statements, in substance and in part: (i) Dr. Khaziran routinely treats current and former athletes (including from the NBA) and their families; (ii) Dr. Khaziran charges $1,000/day regardless of how long a patient is at ACRC or the number of services rendered to the patient, although on occasion, if a patient leaves the facility early, charges may be less than $1,000; (iii) Dr. Khaziran treated 52 of 60 NBA players, on a list of players provided to him by the interviewers, and does not recall treating the following players: Alan Anderson, Anthony (Tony) Allen, Antoine Wright, Charles Watson Jr., Ronald Glen Davis (may have seen at some time), Shannon Brown (does not believe he is a patient but name is familiar), Sebastian Telfair (not a patient but treated his wife); and (iv) Dr. Khaziran reviewed letters of medical necessity and suggested that there were issues with the letters—insofar as the signatures did not appear to be authentic and the language contained in the letters was unusual— and could not confirm that they were his letters.

On or about December 9, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Anthony ("Tony") Allen. The case team has since learned that during the December 9, 2019 interview, Allen made the following statements, in substance and in part: (i) Allen received a letter seeking further verification; and (ii) Allen would do what he can to repay the money. According to the non-law enforcement individuals who conducted this interview, this interview was conducted over Skype and lasted about ten minutes or less at night.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Ronald Glen Davis. The case team has since learned that during the December 10, 2019 interview, Davis made the following statements, in substance and in part: (i) Davis did not misuse his healthcare reimbursement account; (ii) Davis had some concern that his identity had been stolen; (iii) Davis

did not submit reimbursement claims for "Dr. Pat" and Dr. Wahab; and (iv) Davis did not submit a letter of medical necessity. According to the non-law enforcement individuals who conducted this interview, this interview was conducted while Davis was in his car on the phone and was somewhat distracted.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Charles ("C.J.") Watson Jr.. This case team has since learned that during the December 10, 2019 interview, Watson Jr. made the following statements, in substance and in part: (i) Watson Jr. did not engage in any wrongdoing regarding his healthcare reimbursement account; (ii) Watson Jr. was aware of a conversation at the Big 3 tournament regarding being entitled to funds in individuals' HRA funds; (iii) Watson Jr. submitted reimbursements; and (iv) Watson Jr. received services in Seattle.

On or about January 19, 2022, the National Basketball Association Players' Health and Welfare Benefit Plan (the "Plan"), through counsel, informed the case team that the Plan takes "no position" as to whether or not the Plan is a victim of the conduct charged in the Indictment in this case.

On January 5, 2022, the discovery coordinator questioned the Government, with respect to the December 8, 2021 production, why certain .eml files in folder "02. 2703(d)\Apple\20 MAG 6032" (the "Folder") contain no subject or email body. The .eml files contained with the Folder were produced to the defendants in the form they were received from Apple. Further, because the Folder contains returns from an order issued pursuant to 18 U.S.C. § 2703(d), they should not contain content. When a paralegal working on this case examined the Folder in response to the discovery coordinator's January 5 query, they observed that at least two of the .eml files in the Folder appeared to have content. To the extent that .eml files in the Folder contain content information, the Government did not rely on that content in investigating and charging this case, and will not rely on any such content information moving forward.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

<div style="text-align:right">
Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612
</div>

06.20.2018



**U.S. Department of Justice**

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*
Received by GLG
May 2, 2022

March 25, 2022

**By Email**
Matthew Laroche
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
(212) 530-5000
mlaroche@milbank.com

Re: *United States v. Williams, et al.* 21 Cr. 603 (VEC)

Dear Mr. Laroche:

The Government writes in response to the February 15, 2022 letter (the "Letter") sent by certain defendants in the above-captioned case (the "Defendants").

*First*, in their Letter, the Defendants pose several questions about the interviews conducted by third-parties, certain summaries of which were reported to this Office and disclosed in the Government's February 1, 2022 letter. The Government's understanding is that Plan counsel conducted the interviews, but the Government does not know the identity of all of the individuals who participated in, or conducted, the interviews. The Government first learned of Plan counsel's interviews after they occurred. The Government did not direct that Plan counsel's interviews occur, nor did the Government or the FBI participate in Plan counsel's interviews. Plan counsel ████████████████████████████████████████████████████████ provided information about the interviews to the Office and FBI during meetings on January 22, 2020 and February 27, 2020.

As the Government did not participate in the interviews, the Government did not record or memorialize them. Instead, the Government and/or FBI agents took notes of Plan counsel's summaries of their interviews during the above-described meetings on January 22, 2020 and February 27, 2020, and provided the substance of those notes in its February 1, 2022 disclosure letter. The Government is now producing notes from its January 22, 2020 and February 27, 2020 meetings with Plan counsel pertaining to Plan counsel's summaries of its interviews with particular Defendants and other relevant individuals. Those notes are attached. With respect to whether the summaries of the interviews were used to support any process sought by the Government, the Government refers Defendants to the affidavits and process in this case, which were previously produced to the Defendants in discovery. The Government did not reference Plan counsel's interviews in the Grand Jury. The Government reserves the right to introduce at trial certain statements made by the Defendants during Plan counsel's interviews. The Government is not aware of any obligation precluding it from doing so, or for that matter, any reason it would be

06.20.2018



precluded from relying on statements made during the interviews in legal process or the Grand Jury.

*Second*, the Defendants pose several questions about the Plan's statement that it takes "no position" as to whether it is a victim in this case. ▓▓▓▓, on behalf of the Plan, made the statement during a January 19, 2022 call with the Government. Participants on that call were ▓▓▓▓, who is a paralegal in the Office. The Government does not believe it has an obligation to disclose all of its communications with Plan counsel on January 19, 2022 or, as the Defendants request, "at any other time" about the charged conduct.

The Defendants also inquire about "the reason for" the January 19, 2022 communication. On December 21, 2021, during a call with ▓▓▓▓, notes from that call reflect that ▓▓▓▓ stated, in substance and in part, the following: (i) "it's not the client's position that we (the HRA)[1] are the victims, it is collectively a view from the HRA that, assuming the allegations are true, it's not laudable conduct, but that the players were stealing their own money, because of the siloed nature of the accounts and because the accounts are funded based on the players' service as part of labor negotiations. This is not like HRA structures where there is a pot of money and everyone suffers. Victim is not a word we've used internally;" (ii) "to the extent that a victim is someone who could suffer as an adverse effect, then the HRA is a victim;" (iii) "as a separate point, we have heard from people that don't think of themselves as a victim;" and (iv) "your statement during the press conference about the impact on taxpayers left us scratching our heads." In addition, notes from the same December 21, 2021 call reflect that ▓▓ was asked "whether it is was correct that teams contribute money to the Plan for legitimate medical expenses of players and their families. Not to have an additional source of income – like buying a car," and in response, ▓▓ agreed it was "definitely not" for that purpose.[2] The Government subsequently requested clarification as to the Plan's position regarding whether it considered itself a victim of the Defendants' conduct. As indicated in our February 1, 2022 letter, ▓▓▓▓, the Plan's counsel, provided the Plan's position to the Government on January 19, 2022, which has been communicated to the Defendants. ▓▓▓▓ also clarified that ▓▓▓▓ statements were his personal opinions and not the position of the Plan.

Finally, the Government notes that it is continuing to review the materials in its possession, and will make additional disclosures to the extent required.

---

[1] The Government understands that "HRA," as used in this context, is synonymous with "the Plan."

[2] On or about June 29, 2020, notes reflect that ▓▓▓▓ stated on a phone call, in substance and in part, that: "each player has individual account within the trust. Player X has account with trust administrator. His money on account but limits as to how it can be drawn on it. At some level taking money out of their account. They are their own victim."

This letter is marked "Confidential" under the terms of the Protective Order in this matter.

        Very truly yours,

        DAMIAN WILLIAMS
        United States Attorney


by: _____/s/_____
        Kristy J. Greenberg
        Ryan B. Finkel
        Assistant United States Attorneys
        (212) 637-2469/6612

Copies to: All counsel



**Tony Allen** – 12/9/19

Spoke about 10m or less, at night, he had received letter seeking further verification.

He said he would do what he can repay the money.

(PK Note: conversation was distracted over Skype)

**CJ Watson** – 12/10/19

Denied any wrong doing.  Awareness of conversation at Big 3 tournament re: entitled to funds in individual funds in HRAs.  Stated put in reimbursements

**Glenn Davis 12/10/19**

(PK note, spoke on phone whil in car and somewhat distracted)

Stated denied misue of account, had some conern his identity had been stolen.  Denied claims to reimbursement to Dr. Pat, Dr. Wahab and denied putting in LMN.

CONFIDENTIAL

Received by GLG
May 2, 2022



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 25, 2022

To: All Counsel

  Re: *United States v. Williams, et al.* 21 Cr. 603 (VEC)

Dear Counsel:

  The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information.

  In July 2020, ▮▮▮▮▮, an employee of Pro-Flex Administrators LLC ("Pro-Flex"), who worked on the NBA Players' Health and Welfare Benefit Plan's (the "Plan") account, stated to the Government, in substance and in part, that: ▮▮ did not see anything unusual regarding Unforgettable Smile invoices. ▮▮ spoke with ▮▮▮▮ [a Pro-Flex colleague] about Unforgettable Smile. It was under a microscope because there was suspicion that services were not being rendered. When trying to validate services from Unforgettable Smile, they were unable to validate the services.

  In July 2020, ▮▮▮▮▮, an employee of Pro-Flex, who worked on the Plan's account, stated to the Government, in substance and in part, that: while working at Pro-Flex and answering calls as part of her daily responsibilities, ▮▮ spoke with Ronald Glen Davis on November 13, 2019. The two discussed a claim from Unforgettable Smile for Davis, which he denied. ▮▮ recalled being dumbfounded when Davis claimed that Williams took his personal information.

  In July 2020, ▮▮▮▮▮, an employee of Pro-Flex, who worked on the Plan's account, stated to the Government, in substance and in part, that: (i) Pro-Flex employees would provide information to the caller believed to be Williams, but pretending to be Davis, because they had no reason not to provide the information after the security questions were answered correctly. ▮▮ asked her team to start noting when the caller ID would display Terrence Williams's name. ▮▮ also recalled instances when the Pro-Flex team would receive calls from two different voices on the same day and asking the same questions. There were also instances when the caller, believed to be Williams, would provide an alternate call-back phone number. The first question Pro-Flex employees ask when answering the phone is "may I have your name?" The caller, believed to be Williams, would respond with Davis's name, and never identified himself as Williams to Pro-Flex employees. Once the team noticed the trend and ▮▮ was made aware, the team documented the inbound telephone numbers. At least as of June 26, 2019, if the caller ID showed up as Williams, Pro-Flex staff would make note of the occurrence; and (ii) the caller believed to be the real Davis was described as much nicer, softer spoken, and understood that it took time for claims to be processed. The caller believed to be Williams was described as agitated, abrupt, and



impatient. There are entries in the "NBA Contact Log" where the member calling could in fact be Williams. ███████, and Pro-Flex are represented by ███████.

The Government is producing today notes from conversations with ███████, both of whom the Government consulted as potential expert witnesses. Also produced today are conversations with counsel from Wells Fargo.

On or about October 7, 2021, and October 11, 2021, an individual ("Individual-1") who prepared invoices for Advanced Chiropractic and Rehab Center ("ACRC") stated to law enforcement officers, in substance and in part, that Individual-1 understood that ACRC had NBA players, athletes, and famous people as clients. Individual-1 is represented by ███████.

On or about October 7, 2021 and December 17, 2021, an individual ("Individual-2") who once worked at Unforgettable Smile stated the following, in substance and in part: (i) for celebrities, it was normal to have a 'middle man' to communicate with and send documents to; (ii) it felt odd sending patient treatment plans to anyone other than the patient; (iii) Individual-2 was asked to create fake invoices by Wahab, and created the fake invoices. Wahab stated the invoices were for his celebrity patients whom he made prior arrangements with; (iv) Individual-2 contradicted their previous statements and stated they never made fake invoices for Wahab; and (v) defendant Terrence Williams received dental services to include crowns and sedation performed by Wahab. Individual-2 is represented by ███████.

On or about October 7, 2021, an individual ("Individual-3") who worked at Innovative Men's Clinic stated to law enforcement officers, in substance and in part, that (i) Individual-3 did not create patient invoices unless Individual-3 met with the patient; (ii) Individual-3 was never advised by Dr. Washington to create an invoice or receipt without seeing the patient first; (iii) sometimes Dr. Washington instructed Individual-3 to bill patients without ever seeing the patient; and (iv) sometimes Dr. Washington called Individual-3 and instructed Individual-3 to bill patients without Indiviudal-3 ever seeing the patient. Individual-3 would manually enter the credit card information and charge it for the amount directed by Dr. Washington. The signature line of the receipt stated Signature Verified. Individual-3 advised this replaced the patient's signature, which had been approved by Dr. Washington. Individual-3 felt it was odd but did as instructed. Individual-3 later revised his statement and stated that Dr. Washington only asked Individual-3 to produce a receipt in connection to this one incident. Individual-3 is represented by ███████.

In conversations with the Government, a second individual ("Individual-4") who worked at Innovative Men's Clinic stated to law enforcement officers, in substance and in part that (i) Ely and Palacio were provided sports injury treatments, which are outside IMC's core business. Ely and Palacio are "on the side" patients that were treated as VIPs by Dr. Washington; (ii) Ely and Palacio were IMC patients for approximately two years; (iii) Dr. Washington must have been tricked into doing something wrong and is not business savvy; (iv) Individual-4 is not aware that Dr. Washington was committing fraud; and (v) Individual-4 did not see anything wrong with

charges for Ely and Palacio's services after IMC's accounting firm approved and because the charges were "going through." Individual-4 is represented by ███.

In conversations with the Government, the individual identified as CC-1 in the Indictment stated the following, in substance and in part: (i) Williams also used cellphone numbers 206-483-7188 and 206-775-1740; (ii) CC-1 did not recall Williams giving CC-1 the name Greg Smith, specifically. CC-1 further advised that Williams likely gave CC-1 this name because these invoices look like the other invoices in CC-1's email account; (iii) CC-1 did not recall the name Antione Wright; (iv) Williams received dental services from Unforgettable Smile. CC-1 is represented by ███.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter. Its attachments are marked "Confidential."**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612

06.20.2018



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG
May 2, 2022

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 2, 2022

To: All Counsel

    **Re:**    *United States v. Williams, et al.* **21 Cr. 603 (VEC)**

Dear Counsel:

    The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information.

    During the course of several proffers, Melvin Ely made the following statements, in substance and in part: (i) Dr. Washington provided a medical consultation on their second phone call; (ii) defendant Terrance Williams used the phone number (310) 717-1420; and (iii) Ely was involved in a "similar scheme" with Keyon Dooling that he thought was on "the up and up."

    During the course of several proffers, C.J. Watson made the following statements, in substance and in part: (i) Watson saw Dr. Khaziran in approximately August or September of 2017 for issues with his Achilles heel and his knee. Watson visited Dr. Khaziran's office in Los Angeles two to three times "at most." When Watson visited the office, he would meet with Dr. Khaziran's assistant and discuss his issue with Watson's assistant. Watson would then meet with Dr. Khaziran for approximately 30 to 45 minutes; and (ii) Defendant Alan Anderson told Watson that it was "our money," and that Anderson had been working with Williams. Anderson told Watson that Williams knew about the Plan's accounts and worked with doctors to get invoices to submit for reimbursement.

    During a proffer, Eddie Robinson made the following statements, in substance and in part: Robinson called Dr. Khaziran, and during the call, Robinson asked Dr. Khaziran if he knew defendant Terrence Williams. Dr. Khaziran stated that Williams was a great guy, was a patient of his, and was having money issues. Dr. Khaziran knew about the "NBA program," and had helped Williams by giving Williams invoices to submit to the plan for Williams to get reimbursed. Robinson told Dr. Khaziran that Robinson had $60,000 worth of invoices from Dr. Khaziran's clinic. Dr. Khaziran then told his secretaries to cancel all his appointments in a frantic and panicked way. Dr. Khaziran then asked Robinson to email the invoices for him to see for himself. Dr. Khaziran then said "wow" these are my invoices.

    During the course of several proffers, ▮▮▮▮▮▮▮▮ made the following statements, in substance and in part: (i) Defendant Alan Anderson said we have money in the fund, it is our money – we can't get in trouble – because it is your money. Initially, Anderson did not say it was illegal. Wright had asked Anderson whether "they" [the Plan] are going to believe Anderson had

06.20.2018

those procedures, and Anderson responded that "everybody is using this money, it is your money and you won't be in trouble." This made Wright feel more comfortable; and (ii) with respect to defendant Glen Davis, Wright believes that Terrence Williams may have taken advantage of Davis. Williams told Wright that Williams called the Plan and talked to the Plan while pretending to be Davis because Davis did not know what to say.

Attorneys for Dr. Patrick Khaziran stated to the Government, in substance and in part, that they believe their client would state the following: (i) Dr. Khaziran initially believed the money on the NBA Players' Plan cards was taken from player's paychecks and reserved for their use after playing. He later learned this impression, that the funds came from the players' paychecks, was mistaken; (ii) certain athletes were in the "VIP plan" at ACRC and/or Sports Rehab LA and for "VIP patients," they could come and go as they please, and there are not always medical records or documentation for each visit; and (iii) ACRC and Sports Rehab LA are not permeated with fraud. Patrick Khaziran is represented by Vince Farhat and Lena Streisand of Jeffer, Mangels, Butler & Mitchell LLP.

On April 20, 2022, an employee of ACRC and Sports Rehab LA testified in the Grand Jury on behalf of ACRC and Sports Rehab LA, and stated the following, in substance and in part: (i) Dr. Khaziran performs home visits for treatment; (ii) after examining KHAZ000271, the witness concluded Ronald Davis was present at ACRC and Sports Rehab L.A. on August 2, 2021 and August 3, 2021; (iii) some athletes pay different prices than non-athlete patients; (iv) athletes listed in KHAZ000006 and KHAZ000273 were charged $1,000 per visit; (v) KHAZ003432 indicates that patient visited ACRC/Sports Rehab LA on November 19, 2018. ACRC and Sports Rehab LA are represented by David Vaughn of Vaughn Law Offices.

In conversations with the Government, an individual identified as CC-1 in the Indictments stated the following, in substance and in part: defendant Terrence Williams knew of a member on the NBA Players' Association Board that approved the invoices a doctor from ACRC submitted for reimbursement. This board member knew that the invoices the doctor from ACRC submitted for reimbursement were fraudulent. CC-1 did not know the name of this person, and CC-1 was not sure whether this person was an actual member of the NBA Players' Association Board. Williams told CC-1 the invoices CC-1 made would get approved because this person was on the board. This person may have had a say in Williams's financial assistance request. This board member also knew the doctor at ACRC before Williams knew of this doctor. Williams told CC-1 this board member engaged in the same scheme with the doctor from ACRC. It was CC-1's

understanding that these invoices were approved by the board member. CC-1 believed that this board member was a retired NBA player. CC-1 is represented by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

        Very truly yours,

        DAMIAN WILLIAMS
        United States Attorney


by: _____/s/_____
        Kristy J. Greenberg
        Ryan B. Finkel
        Assistant United States Attorneys
        (212) 637-2469/6612



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

Received by GLG via ECF
March 31, 2023

CDA Note: Per Court Order, the Government reproduced this revised letter on 3/31/23. Please see Docket Entry 887 for more information.

September 18, 2022

To: All Counsel

Re: *United States v. Williams et al.*, 21 Cr. 603 (VEC)

Dear Counsel:

*First*, as you know, on August 31, 2022, a Grand Jury returned superseding indictment S7 21 Cr. 603 (VEC). Although the Government had no legal obligation to do so, in response to defense counsel's prior correspondence, *see* 6/9/22 Ltr. From A. Apps to K. Greenberg, at 2-3, during the August 31, 2022 presentation to the Grand Jury, prior to the Grand Jury's vote on S7 21 Cr. 603, a law enforcement witness testified in substance before the Grand Jury that the Plan had informed the case team that it took "no position" on its status as a victim in this case.

*Second*, the Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information:

- As previously disclosed in the Government's March 25, 2022 letter, employees at Proflex believed that Terrence Williams called Proflex while assuming the identity of Ronald Glen Davis. The Government has information from several sources that Williams impersonated Davis.

- On or about July 23, 2020, ███████, a Proflex employee, stated to the Government in substance and in part that she believed Milt Palacio was not on the list of individuals the Proflex team had suspicions about. ███████ is represented by ███████ of ███████.

- On or about October 25, 2021, ███████, who submitted claims to the Plan at defendant Glen Davis's request, stated the following, in substance and in part: (i) Williams "was aggressive" with Davis about submissions to the Plan; (ii) Williams was harassing Davis. Davis asked ███████ to handle it and Davis told ███████ he wanted Williams off his back; (iii) ███████ did not think Davis and Williams were working as a team on this. Williams approached Davis with this scheme idea. Davis got caught up in it, but he "bailed on it" when it became too much; and (iv) ███████ thought Davis was visiting a physical therapist for services because Davis was injured.

- On or about September 7, 2022, a witness who serves as outside counsel to the Plan and manages the Plan benefits, was interviewed by the Government and the FBI. That witness stated, in substance, that, while in colloquial speech she may sometimes refer to the

nominal Plan accounts as belonging to the players who have a right to file claims, the money in fact belongs to the Plan and players just have a qualified right to the benefit. The witness is represented by ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2469/2486

06.20.2018