
**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza, 37th Floor
New York, New York 10278

April 25, 2024

<u>BY ECF</u>
The Honorable Valerie E. Caproni
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Ronald Glen Davis*, S9 21 Cr. 603 (VEC)

Dear Judge Caproni:

    The defendant in this case, Ronald Glen Davis, is scheduled to be sentenced on May 9, 2024, following his trial conviction of one count of conspiracy to commit health care fraud, one count of conspiring to make false statements relating to health care matters, one count of health care fraud, and one count of wire fraud. The applicable Guidelines Sentencing Range for the defendant is 37 to 46 month's incarceration. And, as set forth below, the Government submits that a sentence within that Guidelines Range is sufficient and no greater than necessary to advance the ends of sentencing.

    Davis stands apart from co-defendants who merely made a false submission to the Plan. Davis took several additional steps to further the fraud. These steps included utilizing forged signatures to fool the plan, submitting revised fraudulent invoices, visiting a doctor for a phony appointment, and lying to Plan counsel who conducted an internal investigation of the fraud. On top of that, and separate and apart from his conduct with Williams, Davis launched his own sub-scheme to defraud the Plan with Rashad Sanford. These several serious acts, and the lack of any acceptance of responsibility, warrants an incarceratory sentence.

    **I.**    **Background**

    **A. Overview of the Scheme**

    The defendant, a former professional basketball player in the National Basketball Association, took part in a scheme to commit fraud against the NBA Players' Health and Welfare Benefit Plan (the "Plan").

    Among other benefits, the Plan provides current and retired NBA players, who satisfy certain eligibility criteria, with reimbursements for qualifying medical expenses. Players are eligible to draw on a particular amount of funds, which is based on the number of seasons in which the individual played in the NBA. NBA teams fund the Plan on a regular basis. Funds available also increase and decrease based on a pro rata distribution of the Plan's investment gains or losses.

In addition to players eligible to participate, certain spouses, children, and other dependents ("Participants") may also submit claims to the Plan.

Participants can submit claims to a third-party administrative manager. Participants can also use a debit card that is directly funded by the Plan. Where funds are dispersed and claims are approved, Participant medical expenses are paid for directly or expenses are reimbursed.

Co-conspirator Terrence Williams was a leader in the scheme, obtaining fraudulent invoices from medical professionals, and others, and allowing others to defraud the Plan. Williams collected kickbacks from his co-conspirators for his coordinating role in the fraud scheme.

Williams worked with various doctors and medical professional to obtain these fraudulent invoices, including co-conspirators Dr. Pat Khaziran, Dr. Aamir Wahab, and Dr. William Washington. Khaziran is a California-based chiropractor; Wahab is a California-based dentist; and Washington is a Washington State-based physician who operates a wellness practice. Williams also relied on co-conspirators to create fraudulent invoices that were designed to appear as though they were created by Khaziran's chiropractic office.

From in or about 2016 through in or about June 2019, Williams, Khaziran, Wahab, and others worked together to create false and fraudulent invoices for medical services.

The Plan paid out more than $1.6 million in fraudulent Khaziran claims. Khaziran's Los Angeles chiropractic clinic went by the names Advanced Chiropractic and Rehab Center and Sports Rehab LA. Khaziran collected approximately one third of the fraudulent Plan proceeds for his participation in the fraud scheme. Williams also directed two other co-conspirators, who were not affiliated with Khaziran, to create fraudulent invoices that appeared to be invoices from Khaziran's clinics. $2.6 million worth of those fraudulent invoices were submitted to the Plan. Wahab created at least $1.1 million worth of fraudulent invoices that were submitted to the Plan by Williams and his conspirators.

### B. Davis's Criminal Conduct

#### i. Davis's Involvement in the Williams Conspiracy

In May 2019, Davis obtained fraudulent invoices from Terrence Williams. Those invoices indicated, falsely, that Davis obtained physical therapy services from Khaziran and dental services from Wahab. In truth, the Khaziran invoices were created by a real estate broker that Williams befriended. The Wahab invoices were created by Wahab's dental office. Davis never received services from Wahab or Khaziran. The invoices falsely indicated that Davis spent $215,000 at Khaziran's clinic and $132,000 at Wahab's practice.

Rather than fill-out the reimbursement claim form himself, Davis sent the fake invoices to his business manager Edgar Abrams. Abrams was suspicious that the invoices were illegitimate and effectively warned Davis: "I told him every claim that was submitted, the plan verifies them. They make sure that these are valid invoices prior to, you know, reimbursement." (Tr. 72-73.) Abrams warned Davis several times, asking him whether the invoices were "his." Despite these

warnings, Davis decided to move forward with the fraud, and he confirmed to Abrams that the invoices were legitimate and related to services Davis had received. But as Davis well knew, they were not.

Abrams filled-out the claim form for Davis, sent it to him, and Davis signed it. It was submitted to the Plan. But the reimbursement claim did not work. On May 21, 2019, Pro-Flex requested from Davis "a copy of the cancelled check (or other proof of payment)" to verify the expenses. Davis sent the Plan's request to Williams and soon obtained from Williams a second set of invoices for the Khaziran claims. This second set of invoices were modified by Williams's former girlfriend. This set reflected that Davis paid Khaziran for services. On May 31, 2019, Davis emailed those modified fraudulent invoices to Pro-Flex. But Pro-Flex did not reimburse the claim.

Next, Davis and Williams sent to Pro-Flex a forged letter of medical necessity. On May 31, 2019, Davis received an email from Pro-Flex requesting a letter of medical necessity. Davis took a screenshot of that email on his phone and sent the screen shot to Williams. (GX1005.) Williams obliged by creating two forged letters of medical necessity—one purportedly signed by Khaziran and a second purportedly signed by Wahab. (GX507, 508.) But the letters did not work.

The next step Davis took was a visit to Dr. Thompson's office for a phony medical appointment. At trial, Antoine Wright described what transpired. Davis, Wright, C.J. Watson and Alan Anderson visited Dr. Thompson after hours. No other staff were present. The co-defendants received, at best, a perfunctory examination. They joked about the fake letter of medical necessity in the parking lot and then left. Days later, Davis received a letter of medical necessity from Dr. Thompson. On June 25, 2019, Davis emailed that letter to Pro-Flex. That same day, Davis sent Williams $1,000 via Square—a payment for the Thompson letter of medical necessity. But this letter did not work.

On July 5, 2019, Davis emailed Pro-Flex and asked for an update on his reimbursement request. GX750 ("Please reach out to let me know about this reimbursement.") On September 5, 2019, Pro-Flex sent Davis a HIPPA release form seeking his consent for the Plan's external counsel to obtain documents from Wahab's dental practice. The same day, after reading the letter, Davis called Pro-Flex. During that call Davis stated "I submitted a claim for my teeth." (GX 518.) Davis never signed the HIPPA release form. As the Court heard in these recordings played at trial, Davis was intelligent and alert during these calls. He knew exactly how to use the Plan and how to defraud it.

On November 13, 2019, Davis was unable to use his Plan debit card. He contacted the Plan, received a letter from Pro-Flex (which he stated he had read), and was informed that his card was deactivated. During that call, now that he had been caught, Davis attempted to create distance between himself and Williams. On the call, Davis claimed he had "nothing to do with" Unforgettable Smile and that "some guy named Terrence" took other people's claims. When asked who Terrence was, Davis stated "I don't know him. I have no idea who [he] is, I have no idea."

Davis's cover-up attempts continued in December. On December 10, 2019, Davis had a 48-minute call with counsel the Plan hired to investigate potential fraud. On that call, Davis

claimed he did not know who Terrence William was. Davis also stated he had fake teeth and never went to Unforgettable Smile. (Tr. 1263.) Davis stated he saw Khaziran four to six times and paid $600 cash for each visit.

### ii. The Davis-Sanford Conspiracy

Davis also defrauded the Plan without Terrence Williams's help. In 2019, after the Khaziran and Wahab invoices did not work, Davis conspired with Dr. Sanford of Atlanta Spine Doctors. This time, Davis arranged to have Sanford charge Davis's Plan-issued Debit Card for services that were never performed. On September 19, 2019, Davis sent Sanford a photograph of his Plan-issued debit card and a list of Davis's purported "injuries." Davis also forwarded Sanford an email from his former business manager which provided Sanford the tax identification number for "Big Baby Entertainment." Sanford's and Davis's plan was for Sanford to charge Davis's Plan debit card and for Sanford to create corresponding fake invoices relating to those purported charges. Sanford would then transfer to Davis's company much of the funds that Sanford had fraudulently billed to the Plan, while Sanford pocketed the rest.

On October 1, 2019, Sanford sent Davis a series of fake invoices to justify the billing Sanford had directed upon Davis's Plan card. Also emailed were receipts indicating that the Plan debit card and Davis's personal credit card were charged approximately $112,250. Thereafter, over four different dates, Atlanta Spine Doctors wired Big Baby Entertainment $44,000. These wire transfers represented fraud proceeds. And the fraud and the payment to Davis appears to have been by his design.

## II. Discussion

### A. Applicable Law

Following *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence Within the Guidelines Range Is Sufficient and Not Greater Than Necessary

A sentence within the Guidelines Range is appropriate but not greater than necessary to comply with the purposes of sentencing. The factors most relevant to imposing sentence include the seriousness of the defendant's offense, the need to promote respect for the law, and the need to afford adequate deterrence to criminal conduct.

The conduct at issue is indisputably serious. The defendant took part in a broad conspiracy to defraud the Plan, a benefit extended to NBA players and their families. The defendant stole money from the Plan that was intended to support legitimate health needs of Participants. His crime was clearly one of deceit. The defendant knowingly submitted false and fraudulent invoices to the Plan in order to steal money to which he was not entitled.

The seriousness of Davis's offense is uniquely compounded by Davis's engineering of a separate scheme to defraud the Plan. Davis came up with the idea to use Sanford to fraudulently obtain Plan funds when the invoices he obtained from Williams failed to work. Davis sent Sanford his debit card information and a list of purported injuries. When the Plan requested invoices to back up these debit card charges, Davis got Sanford to prepare fraudulent invoices. And Davis sent Sanford his corporate information, so that Davis's company could receive substantial portions of the fraud proceeds. Sanford was able to make these payments to Davis's company, distancing Davis personally from the fraud and appearing as if Davis's company served as some kind of service provider to Sanford's clinic.

The defendant's conduct also risked harming victim Plan participants. With respect to Davis, this is not an abstract concern. Abrams testified that Davis used Plan funds to cover healthcare expenses for his daughter. When Davis's Plan-issued card was frozen because of his fraudulent conduct, he risked his ability to provide for dependents like his daughter. Moreover, the Plan benefits were fought for and obtained over the course of negotiations between the league and the NBA Players' Association. The defendant's crime undermines trust in the Plan and the provision of Plan benefits and could chill the provision of benefits and the construction of benefit programs. In addition, the defendant's conduct involved improper use of the tax treatment of Plan

funds, which could risk the tax-free treatment applied to Plan reimbursements for all Plan Participants, including for legitimate claims.

Davis's lack of acceptance of responsibility speaks to a particular need to advance specific deterrence and promote respect for the law. Davis so far appears unwilling to accept the wrongfulness of his actions. This is particularly notable given that Davis has a prior conviction for battery which caused a serious bodily injury. Davis's compliance with pretrial release conditions was poor. He was admonished by this Court for traveling without permission on several occasions. (Including an instance in which the FBI saw him at basketball game on television.) Davis did not report his address to pretrial services. (PSR ¶ 218.) Davis was generally not compliant, refused to answer questions about his employment, failed to indicate who he lived with or even provide documentation concerning his lease. (PSR ¶ 219.) Davis also had several positive drug tests. (PSR ¶ 230.) Collectively, Davis has demonstrated a carefree attitude to the seriousness of these proceedings at least until trial.

General deterrence is also an important consideration in sentencing the defendant, as well as his co-conspirators. The defendant's conduct harmed the Plan, the NBA, and current, retired, and future NBA players and their families. This conspiracy harms players and their families who rightfully benefit from the Plan. The scheme here has already triggered administrative changes in how the Plan is administered to tighten controls and avoid future fraud. The Court's sentence should make clear to others that the fraudulent use of the Plan, and similar health benefits is serious, unacceptable, and should not be attempted.

As is clear from this case, it is all too easy to do what the defendants did, all too attractive, and all too difficult to detect until the fraud has reached a substantial scale. This means that a meaningful sentence is warranted. *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

A Guidelines sentence will also avoid unwarranted sentencing disparities. Davis is not similarly situated to other defendants who merely made a false submission and received a sentence of time served. Davis's conduct with Williams was different by a substantial margin from most of the other defendants. Far from just merely sending in a submission and hoping for payment, Davis took several steps to continue the fraud: submitting modified invoices, advancing forged letters of medical necessity, visiting a doctor for a phony doctor's appointment, submitting Dr. Thompson's letter of medical necessity, lying to the Plan on phone call, lying to Plan counsel. The other defendants who participated to that level of conduct were Antione Wright and C.J. Watson

both of whom were sentenced pursuant to § 5K1.1 of the guidelines. Moreover, Wright and Watson did something that Davis has not done: accepted responsibility for their conduct. The foregoing itself distinguishes Davis from the group of his co-defendants that merely made false submissions. But there is more. Davis launched his own fraud conspiracy with Dr. Sanford. And Davis's post-arrest conduct was poor. The sum of these factors place Davis in a category of defendants distinct from most of those that the Court has already sentenced. These aggravating factors compel a sentence of incarceration.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines Range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/
Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-6612/-2486