**SABRINA P. SHROFF**  80 BROAD STREET, 19TH FLOOR
ATTORNEY AT LAW  NEW YORK, NEW YORK 10004
  TEL: (646) 763-1490

April 25, 2024

**By ECF**

Hon. Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

*United States v. Davis*, **21 Cr. 603 (VEC)**
**(Ronald Glen Davis's Sentencing Letter)**

Dear Judge Caproni:

Ronald Glen Davis respectfully submits this respectfully submits this Sentencing Letter in advance of his sentencing in this matter. For the reasons discussed below, Mr. Davis respectfully requests that he be sentenced to time served and three years of supervised release with a community service component and special provisions related to mental health therapy and addiction treatment.

## BACKGROUND

### Ronald Glen Davis

Ronald Glen (Big Baby) Davis was born on January 1, 1986 in Baton Rouge, Louisiana. Presentence Investigation Report ("PSR") ¶ 210. His mother, Tony Davis, age 68, works for a cleaning company. *Id.* He has two maternal half-sisters. His older sister, Toy George, is 46 and a haistylist. *Id.* His younger sister, Lajazzia Davis, is 37 and an AT&T salesperson. *Id.*

Whenever he is asked to describe his childhood, Glen usually answers with a single word: "rough." PSR ¶ 211. He does so not only because he is shy and easily embarrassed with others, but because he has no desire to think too long or too hard on what life was like for him as a child.

Glen never met his biological father. The man he believed was his father, his mother's then-boyfriend, Donald Davis, left the family physically and financially when Glen was young. PSR ¶¶ 210-211. His mother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* PSR ¶¶ 212, 215. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, regularly leaving Glen and his sisters alone for days or weeks at a time ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* When things were really desperate, Glen would sometimes shoplift food from the grocery store to feed himself and his sisters. *Id.* If pressed, Glen will relate to you that an early memory is pulling a needle from his mother's arm after she had passed out. *See* PSR ¶¶ 215; Letter from sister Toy George to Court ("Toy Letter") at 1 (attached hereto as part of **Exhibit A** (letters of support from family and friends)). As Toy puts it: "Your honor, my brother and I never had a moment of stability. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Toy Letter at 1-2; PSR ¶ 215.

When Glen was six, his ▮▮▮▮▮ moved the family to Baltimore, MD. PSR ¶ 212. Shortly thereafter, she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Glen and his sisters returned to Baton Rouge and were placed in the care of their maternal grandmother, Mosana George, a cafeteria worker. *Id.* Even after ▮▮▮▮▮▮▮▮▮▮▮▮▮ and through Glen's high school,

Hon. Valerie E. Caproni                                                                                                                April 25, 2024
Judge, Southern District of New York                                                                                                  Page 2
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

college, and adult years, ███████████████████████████████████. *Id.* No matter how Glen and others tried to help – for example, while Glen was in High School, ███████
███████████████████████████████

Unsurprisingly, Glen began to act out, spending most of his time on the streets and not in school. PSR ¶ 215; Toy Letter at 2. Many children who grew up like Glen end up becoming grim statistics. Glen was saved by two things. First, Glen is simply not that kind of person; despite everything, he remained kind and trusting, believing the best of people. *See generally* Letters of Support (Ex. A). Glen was always big for his age, and he could easily have morphed into a bully, but never did. As Ron Klempner, General Counsel of the National Basketball Players Association ("NBPA") observes:

> I have always felt that Glen epitomized this gentle giant character and mindset. He is goodhearted yet impressionable; he has always been very generous with his time, he truly cares about people, and has always used his celebrity to try to make a positive difference in his community. In those instances where he has exercised bad judgment, I don't believe it's ever been because he has evil motives or any sense of malice. I know he has endured significant challenges mentally and emotionally. I have felt this sense of a muddled mind and mental capacity in Glen, both when he was in the league and continuing through my contact with him today.

Letter from Ron Klempner to Court ("Klempner Letter") at 1 (attached as part of Ex. A hereto).

Second, Glen was saved by sports, particularly basketball. As Toy explains: Glen "enjoyed the spotlight of sports as that was the only time he shined and had an achievement. He was not good at school, and he missed so much of it because of the situation with my mother." Toy Letter at 1. Sports gave Glen a reason to stay in school, and the structure and support he otherwise lacked. PSR ¶ 213. It gave him the chance to attend Louisiana State University and then be drafted into the NBA in the second round of the 2007 draft. In the NBA, Mr. Davis played for the Celtics, Magic, and Clippers.

Once in the NBA, Mr. Davis finally had the means to help his family and his community, as he had always hoped. Glen's mother tells the Court that when he was in position to do so, "he came back and gave back by providing school supplies, food and being a mentor to the youth." Letter from Tonya Davis to the Court (Ex. A) at 1; *see also* Report of Mitigation Specialist Lisa McDermott ("McDermott Report") at 7 (attached hereto as **Exhibit B**) (noting that, in 2011, Glen started the Glen Big Baby Davis Foundation helping at risk youth because "Glen knows he has a connection to these kids and believes he can guide them off the streets. He can provide a productive influential mentor to youth"); Letter from Mitchell B. Modell to Court ("Modell Letter") at 1 (attached as part of Ex. A) ("He appeared at many charity functions with me, giving up his precious

---

[1] ███████████████████████████████████████████████████ It is typical of Glen that, despite his mother's neglect, he has "never held a grudge" ███████████████████████
███████████████████████████." Toy Letter at 4.

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 3
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

time to help those less fortunate.").[2]

While Mr. Davis's played in the NBA for eight years (from 2007 to 2015), his career was marred and then cut short by injury. *See* PSR ¶ 222 (detailing his serial injuries and surgeries while in the NBA). Since retiring for medical reasons from the NBA, Mr. Davis has been involved in a number of jobs related to sports. *See id.* ¶¶ 236-241. Among other things, he attempted a basketball comeback in 2018 in the Canadian NBL; he is a working actor with a SAG card; he tries to work with other professional athletes and entertainers on brand awareness; and makes various promotional appearances and endorsements throughout the year. *Id.* Notably, these are the types of jobs that will be particularly reduced and less available if Mr. Davis is incarcerated.

Since his retirement from the NBA, things have been hard for Mr. Davis. While the NBPA has now "redoubled our efforts to help players learn fiscal responsibility," Klempner Letter (Ex. A) at 2, no one was there – either in his childhood or in his union – to teach Glen about managing his sudden money. Glen "did not know to handle financial gain." Toy Letter at 3. Making money for the first time in his life, Glen "knew that he was the bridge, the anchor the financial backbone for his family his mom, his daughter, his sisters, his niece and nephew. He knew that he was the only way that we can actually have a better life is he paid for it, and when he could not, it was bad for us all." *Id.* With his kind heart and his sense of obligation, Glen "moved us [his family] all out of Louisiana and to Atlanta where he purchased my mom a home. He purchased automobiles for myself, my mom, and sister. He put my sister kids in private schools. My brother paid for us to travel to different cities and watch him play basketball. He gave money to friends and even strangers in the neighborhood." *Id.* at 3-4. Predictably, those he helped abandoned Glen as soon as the money ran out. "Now, he has nothing and not many helped him. After his injury, no one bothered about Glen and [after his] arrest, they all acted as they did not even know Glen. He is very depressed." *Id.* at 4. *See also* Klempner Letter at 2 ("I find it particularly sad that not one of the many people who benefited from Glen's generosity has been around to reflect that same generosity back to him."). Ironically, while Glen is couch surfing, most of his family live in fully paid up houses he bought for them.

While the broke professional athlete is almost a cliché, Mr. Davis has certain emotional problems (anxiety and being easily overwhelmed) and mental challenges (a below average IQ) that made him particularly vulnerable. As his sister Lajazzia puts it: Glen is "too trusting" and "can easily be taken advantage of by others." PSR ¶ 215. Mr. Davis's emotional and mental challenges, and their impact on sentencing, is discussed in greater detail below.

Because of his various injuries, Mr. Davis will always have to live with a certain amount of chronic pain and require consistent and constant medical care. *See* PSR ¶ 222  In addition, Glen was recently diagnosed with diabetes. *Id.* ¶ 221. Diabetes is a terrible disease that has can harm and disable every organ in your body. Glen has been trying to keep his sugar under control, eating right and exercising. However, taking care of your blood sugar, while being 6'8" tall and weighing

---

[2] Mitchell B. Modell is the former owner/CEO of Modells Sporting Goods. He got to know Glen during his years as a professional basketball player, and they have remained friends since then. In his letter, Mr. Modell informs the Court about Glen's many positive qualities and actions, and he asks that they be taken into consideration in sentencing.

Hon. Valerie E. Caproni                                                                                                April 25, 2024
Judge, Southern District of New York                                                                                        Page 4
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

approximately 368 pounds is not simple. Nor is it easy to control blood sugar in prison. Anxiety, stress, and limited food choices are all factors endemic to prisons that make controlling or lowering blood sugar extremely difficult. *See, e.g., Prisoner Diabetes Handbook* at 10-12, available at https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/publication/splc_prisoner_diabetes_handbook_1.pdf; As respected medical journal, The Lancet, has recognized: "Unfortunately, despite the existence of diabetes management guidelines from the Federal Bureau of Prisons, provision of such care is highly variable and often lacking." *Diabetes behind bars: challenging inadequate care in prisons*, The Lancet, Volume 6, Issue 5 (May 2018), available at https://www.thelancet.com/action/showPdf?pii=S2213-8587%2818%2930103-7. Controlling diabeters takes consistency and, in prison, medication is not given at the same time every day, while lockdowns and similar events interfere with both healthcare and food delivery in prisons. We submit that Mr. Davis can best manage his chronic medical conditions outside of prison. See 18 U.S.C. 3553(a)(2) (sentencing goal of "providing a defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner").

**Mr. Davis's Emotional and Mental**
**Challenges and Need for Treatment**

Mr. Davis's has never recovered from the childhood he had and it has had a lasting impact on Mr. Davis as a teenager and as an adult. Some of this impact has been positive – his commitment to his community and loyalty to his friends – and some has been negative – being easily overwhelmed, dependence on others, naivete, depression, and anxiety. Moreover, his emotional difficulties are exacerbated by the fact that Mr. Davis has a cognitive disability. In this regard, two mental health professionals have spoken to and examined Mr. Davis, and their opinions and conclusions – that Mr. Davis suffers from an Intellectual Disability that makes it hard for him to understand many matters and makes him easy to manipulate – strongly support the non-guidelines sentence of time served and supervised release requested.

Dr. Elise Caccappolo of the Columbia Medical Center is a clinical neuropsychologist who performed a neuropsychological evaluation of Mr. Davis. *See* December 14, 2022 Report of Dr. Elise Caccappolo ("Caccappolo Report") (attached hereto as **Exhibit C**).[3] She administered a number of tests to determine Mr. Davis's intellectual functioning. Those results show that he is intellectually disabled:

> Glen was administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV). The primary subtest scores of the WAIS-IV contribute to the primary index scores, which represent intellectual functioning in four cognitive areas: Verbal Comprehension Index (VCI), Perceptual Reasoning Index (PRI), Working Memory Index (WMI), and Processing Speed Index (PSI.) This assessment provides a Full Scale IQ (FSIQ) composite score that represents general intellectual ability. The primary index scores and FSIQ have a mean of 100 and a standard deviation of 15.

---

[3] While the Court declined to admit Dr. Caccappolo's testimony at trial, it can, and should, be considered as part of the Court's individualized sentencing analysis. *See, e.g, United States v. Brown*, 2022 U.S. Dist. LEXIS 145929, *6-9 (S.D.N.Y. Aug. 15, 2022) (taking defendant Brown's intellectual difficulties, and the way they appear to have manifested themselves, in determining whether to grant sentencing reduction to Brown).

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 5
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

> Scores ranging from 90-109 are typically considered average.
>
> Glen's general cognitive ability is within the borderline range of intellectual functioning, as measured by the FSIQ. His overall thinking and reasoning abilities exceed those of only approximately 6% of individuals his age (FSIQ = 77; 95% confidence interval = 73-82). Glen may experience difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities. His verbal comprehension and perceptual reasoning abilities are both in the low average range (VCI = 85, PRI = 84).
>
> His ability to sustain attention, concentrate, and exert mental control is in the borderline range when compared to his peers (WMI = 74).
>
> His ability to process simple or routine visual material without making errors is also in the borderline range (PSI = 76).

Caccappolo Report (Ex. C) at 4.

Dr. Caccappolo also tested Mr. Davis's executive functioning, and determined that "Glen demonstrated impaired executive functioning:"

> Executive functions play a role in organizing, directing, managing, and integrating a variety of cognitive abilities in order to reach a goal or produce a more complex level of cognitive functioning. Executive control includes a variety of important highlevel skills such as sustaining attention over a period of time and in spite of distraction, organizing one's thoughts and behavior before acting, utilizing feedback in order to succeed in a given task, juggling multiple pieces of information at once (mental flexibility), and using planning and organizational skills when approaching a task.
>
> Overall, Glen demonstrated impaired executive functioning. Specifically, he demonstrated a lack of abstract thinking, i.e. difficulty disregarding concrete meaning and understanding figurative meaning. He also exhibited cognitive rigidity, performing poorly on tests requiring flexible thinking and cognitive switching. He demonstrated a lack of planning in order to arrive at the most direct solution when faced with a problem, as well as weak skills when integrating information. Qualitative data from the evaluation revealed poor language comprehension and difficulty understanding both simple and complex speech. He was unable to appreciate sarcasm or nuances. His history of difficulty with emotional regulation is consistent with his executive function deficits, as executive dysfunction often manifests as an inability to self-soothe psychologic arousal induced by strong emotions.

*Id.* at 5-6

In sum, Dr. Caccappolo's interviews and testing led to a diagnosis that Mr. Davis has a moderately severe "Intellectual Disability (previously referred to as mental retardation), which is defined as a

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 6
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

neurodevelopmental disorder that is characterized by intellectual deficits, i.*e.*, reasoning, abstract thinking, learning, both experiential and academic) as well as difficulties in conceptual, social, and practical areas of living." Caccappolo Report at 6 (citing Diagnostic and Statistical Manual of Mental Disorders-5th edition). She concludes as follows:

> [Glen Davis] has a high level of naiveté that can lead him to be victimized. He has no history of antisocial behavior or personality disordered behaviors and deceit and manipulation have not been central features of his personality. Society would be better served by providing Glen with a program of therapeutic support that helps him to understand his personal strengths and recognize the consequences of his actions so as to assist him with the goal of developing resiliency and positive coping skills. If desired, referrals can be made for professionals who would best be able to assist with these types of treatment.

*Id.* at 1-7.

Dr. Caccappolo's diagnosis and recommendation is echoed by mitigation specialist Lisa McDermott. On December 13, 2022, Ms. McDermott provided the Court with a report "to give the Court a better understanding of who Glen Davis is and how his disabilities have influenced his life and how he perceives the world." McDermott Report (Ex. B) at 2. Regarding his mental deficit, she states:

> Glen is in the borderline range of intellect according to his most recent testing. It is not necessary to have formal testing to recognize Glen's deficits. In speaking with him it is obvious that he has difficulty with abstract thinking, problem solving and planning. His thought processes and how he approaches problems are childlike and short visioned. He has difficulty with everyday tasks such as managing appointments, managing his finances and reading/comprehending documents.

McDermott Report (Ex. B) at 6. This cognitive limitation means that "Glen is malleable, and he blindly trusted most people," leading to him being "repeatedly scammed in business and personal matters" (*id.* at 5, 6). Like Dr. Caccappolo, Ms. McDermott recommends that Glen receive "therapeutic and educational interventions" that are best available to him outside of prison:

> Glen Davis is easily exploited. He is vulnerable to pressures. Not only was he not taught life skills but also has no street skills. Glen will have a lifetime of struggles, but he can be successful with proper programming and support. He can be an influential asset to the community. He needs the opportunity to receive therapeutic and educational interventions that he never received.

*Id.* at 7. She notes that Glen is both scared but willing to learn the skills he now needs to succeed in life. He has been actively looking for work as he wants to ensure he never again faces legal issues. *Id.*

Importantly, the government has good reasons to form he same opinions of Glen Davis as do Dr. Caccappolo and Ms. McDermott. Their witnesses have told the government exactly what Dr. Caccappolo's testing has confirmed. The government's 302s and Brady materials say the same

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 7
Re: *United States v. Davis*, 21 Cr. 603 (VEC)

thing as everyone else: Glen was always slow and Terrance Williams took advantage of him. (For the Court's convenience, those materials as combined hereto into **Exhibit D**.) Those materials confirm two key undisputed facts. First, that Mr. Davis has limited cognitive abilities. Second, that one of the ways in which he is affected by his mental disability is that he is unable to handle conflict or pressure and is easily taken advantage of by others. Indeed, his nickname – "Big Baby" – recognizes these cognitive and emotional limitations. Some examples from the Brady letters (Ex. D) follow: (a) A May 2, 2022 Brady disclosure states that, per Antoine Wright, "Terrance Williams may have taken advantage of Davis. Williams told Wright that Williams called the Plan and talked to the plan pretending to be Davis because Davis did not know what to say." (emphasis added); (b) A September 18, 2022 Brady disclosure states that, per Edgar Abrams, "Williams was harassing Davis" and "Abrams did not think Davis and Williams were "working as a team on this." The disclosure goes on to say that Mr. Davis wanted "Williams off his back" and asked his agent, Mr. Abrams to "handle it."; (c) A February 21, 2023 Brady disclosure states that two individuals – one who knew Glen Davis, and one who worked for Glen Davis – describe Mr. Davis as "not smart" and "naïve." One stated that is likely why Davis became involved in the scheme.

As important, every family member, colleague, friend, and fact witness shared this general impression of Big Baby Davis's intellectual limitations, as does the press and the media. *See, e.g.,* Bleacher Report, "Glen Davis Actually Becomes Smarter After Concussion," available zt https://bleacherreport.com/articles/397855-glen-davis-actually-becomes-smarter-after-concussion.

Mr. Davis's intellectual disability impacted his actions here. *See* Brady Letters (Ex. D). As NBPA General Counsel Ron Klempner relates to the Court:

> Specifically with regard to this matter, I do not believe Glen was motivated by a sense of malice. I spoke with him several times as trial was coming up and I can assure you that Glen did not have any fancy defense theories in mind and certainly did not have any nefarious thoughts of beating the system. He is prone to being extremely emotional and is very easily overwhelmed. I do not think he processes information with cogent thinking, or is capable of weighing pros and cons and making important decisions in the same manner as other adults at full mental capacity. I understand that Glen says he was taken advantage of by another player and that he truly believed the money he withdrew was in fact his money to take. I do not doubt that was indeed his mindset.

Klempner Letter (Ex. A) at 1-2; *accord id.* at 2 ("In the times that I have known Glen I have noticed that he really does get overwhelmed and cannot process information with cogent thinking."). Mr. Klempner provides his view to explain, not excuse. *Id.* at 2-3.

Mr. Klempner is equally sure that Glen is able to take corrective action, and that Glen would like nothing more than to contribute positively to society:

> I believe Glen has the ability to recognize when he has done wrong and take corrective action. I believe he understands it now, and I believe his motives in seeing this matter through trial were pure. I saw that he did not testify at trial and while I have no first-hand knowledge of why, I think it is because he is a truthful

Hon. Valerie E. Caproni                                                                                             April 25, 2024
Judge, Southern District of New York                                                                                        Page 8

Re: *United States v. Davis*, 21 Cr. 603 (VEC)

> and decent person. As a high-profile professional athlete, Glen has the potential to serve as an example for many people, young and old, who have overcome adversity and contributed positively to society. I know he is very anxious to show the world his true character, and I would respectfully ask to please give him that opportunity.

*Id.* at 3.

### Mr. Davis's Marijuana Addiction and Need for Treatment

As detailed above, Mr. Davis has been smoking marijuana since he was a 12 year old, and now smokes marijuana on a daily basis to self-treat his depression and anxiety. PSR ¶¶ 213, 230-232. Indeed, while Mr. Davis was "marginally" compliant with the conditions of his bail and never violated (*id.* ¶ 10), he tested positive for marijuana use on more than one occasion. *Id.* ¶ 16. He needs help to quit this lifetime habit, and he can best receive that help while on supervised release.

### Mr. Davis's Offense

On November 15, 2023, Mr. Davis was found guilty at trial on four fraud counts, all stemming from Mr. Davis's participation in a conspiracy to defraud the NBA Health and Welfare Benefit Plan (the "Plan")[4] by submitting reimbursement requests for chiropractic and dental services in California, Washington State, and Georgia never actually provided him. *See* Superseding Indictment [ECF Docket No. 927] at Count 1 (conspiracy to commit health care fraud); Count 2 (conspiracy to make false statements relating to health care matters); Count 5 (health care fraud); and Count 6 (wire fraud); PSR ¶¶ 1-9.

Mr. Davis's false invoices totaled $459,520. Specifically, Mr. Davis submitted invoices in the amount of $215,000 to Chiropractic Office-1 (PSR ¶ 67); invoices in the amount of $132,000 to Dental Office-1 (*id.* ¶ 97); and invoices in the amount of $112,520 to Atlanta Spine Doctors (*id.* ¶ 138). The invoices for Chiropractic Office-1 and Dental Office-1 were never approved. *Id.* ¶¶ 67, 97. Mr. Davis received $44,000 from Atlanta Spine Doctors. *Id.* ¶ 138.

Many of Mr. Davis's co-defendants in this matter already have been sentenced. The sentences imposed on those co-defendants whose roles are closest to Mr. Davis's role in the offense – *i.e.*, other former NBA players who submitted false invoices, but were not leaders or recruiters within the scheme and did not receive kickbacks – are instructive. *See* PSR at p. 6-10 (listing dispositions).[5] The former players within this category who pleaded guilty were sentenced to time

---

[4] As Mr. Klempner of the NBPA, and a trustee of the Plan, explains in his letter to the Court, the Plan has a unique history and structure. The Plan is not like an "insurance plan" where "other consumers or the insurer itself would have to bear the cost of amounts fraudulently withdrawn early from the plan, in this case, no other individual plan participant is being prejudiced by the early withdrawals. The players convicted of this fraud, including Mr. Davis, did not cause any other player to suffer any loss. Their amounts remain entirely intact and available for proper withdrawal." Klempner Letter (Ex. A) at 2-3.

[5] During pretrial proceedings, the government made occasional scattered mutterings contending that Mr. Davis may have originated the corrupt arrangement with Atlanta Spine Doctors ("ASD"). These bald mutterings should be given no weight by the Court. First, as the Court knows, the

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 9

Re: *United States v. Davis*, 21 Cr. 603 (VEC)

served and three years of supervised release. *See* PSR at p. 6-10 (listing dispositions). Mr. William Bynum, a former player found guilty by a jury at trial, was recently sentenced by this Court to 18 months in prison, followed by three years of supervised release. *Id.* at p. 7. We note, however, that the Court concluded that Mr. Bynum perjured himself when he took the witness stand at trial. *Cf,* Klempner Letter (Ex. A) at 3 ("I saw that he [Glen Davis] did not testify at trial and while I have no first-hand knowledge of why, I think it is because he is a truthful and decent person.")

**Probation's Calculation of the Advisory**
**Guidelines Range and Mr. Davis's Objection to It**

The plea agreement calculates a total offense level of 21 and a Criminal History Category of I. PSR ¶¶ 191-201, 205.[6] Taken together, this results in an advisory guidelines range of 37 to 46 months' imprisonment, and a term of supervised release of one to three years. *Id.* ¶¶ 248, 252. Importantly, to get to the total offense level of 21, Probation begins with a base offense level of 7 and then adds 14 levels (7+14 = 21) because "defendant is responsible for an intended loss of $1,075,500." *Id.* ¶ 194. Probation gets to this intended loss amount by adding the loss for defendants Watson ($371,000) and Wright ($245,000) "based on their common visit to a doctor at the Desert Oasis Clinic as part of the conspiracy to get their fraudulent claims approved and paid." *Id.* ¶ 182. By adding these amounts, Probation gets to a 14 level enhancement based on a loss between $550,000 and $1,500,000. Mr. Davis objects to this portion of Probation's calculation.

Any intended loss amount should be limited to the amount of money Mr. Davis sought and intended to collect – *viz*, the amount of invoices submitted by him for chiropractic and dental procedures he claimed to have undergone. This amount totals totaled $459,520 – $215,000 to Chiropractic Office-1 (PSR ¶ 67); $132,000 to Dental Office-1 (*id.* ¶ 97); and $112,520 to Atlanta Spine Doctors (*id.* ¶ 138). Even in a conspiracy, a defendant's liability for the acts of others is limited to those acts that were reasonably foreseeable and within the scope of the criminal activity that the defendant "agreed to jointly undertake." *United States v. Lloyd*, 807 F.3d 1128, 1142, 1145 (9th Cir. 2015). For Probation to try to attribute the losses of Watson and Wright to Mr. Davis because they drove down together to an office, where they each submitted their own paperwork seeking their own reimbursements for their own individual procedures, stretches the concepts of "joint undertaking" and "reasonable foreseeability" too far. *See, e.g., Id.*, 807 F.3d at 1145 (reversing judgment in securities fraud case that attributed loss from California telemarketing boiler room to defendant managing Florida boiler room because defendant did not design overall

---

government adduced no evidence at trial demonstrating that Mr. Davis conceived, set up, or led the arrangement with ASD. Second, in its April 18, 2024 Rashad Sanford sentencing letter, the government does not identify who led the ASD arrangement, further demonstrating that the government lacks any admissible and conclusive evidence on this point. Third, to say that it was Mr. Davis, and not the doctors and administrators at ASD, who ran the wider operation, contradicts common sense.

[6] Mr. Davis has one criminal history point because of an altercation in May 2018. Mr. Davis was outside a Los Angeles club in his car when a drunk crossing the street used his fist to bang and dent Mr. Davis's car. Mr. Davis got out of the car and hit the man for banging on his car, resulting in a battery charge. See PSR ¶ 205, Mr. Davis is ashamed and apologetic for losing his temper and hitting someone. This behavior is entirely aberrant for him.

scheme, did not pool resources, and was compensated from commissions from only his operation).); *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003) (emphasizing distinction between involvement in conspiracy and scope of jointly undertaken activity); *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010) (holding that "a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant.")), *overruled on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1085 (2021).

At the correct intended loss amount of $459,520, the USSG 2B1.1 Loss Table imposes a 12 level enhancement, not a 14 level enhancement, resulting in a revised – and correct – total offense level of 19. In turn, a total offense level of 19 and a Criminal History Category of I yield an advisory guidelines range of 30 to 37 months' imprisonment.

**Probation's Below Guidelines Sentencing
Recommendation and Mr. Davis's Sentencing Request**

While its (mis)calculated guidelines range is 37 to 46 months, Probation recommends a below-guidelines sentence of 24 months in prison (13 months below the low end of the range), and three years of supervised release. *See* PSR, Sentencing Recommendation at p. 56. In declining to recommend a guidelines range, Probation recognized two important mitigating factors: (i) Davis's "difficult upbringing" and "history of mental health issues." *Id.* at p. 54. Probation also recognized the importance of Mr. Davis receiving mental health treatment and drug counseling as special supervisory conditions. *Id.* at p. 55. Mr. Davis agrees with the imposition of these conditions. As previously detailed, Mr. Davis suffers from depression and anxiety, has long struggled with acquiring adequate life skills, and would benefit from drug counseling, given his years of persistent marijuana use.

Mr. Davis believes the appropriate sentence here is time served, with three years (36 months) of supervised release with a community service requirement and special provisions related to mental health therapy and addiction treatment. As discussed below, this sentence is sufficient to meet all the goals of sentencing. *See* Argument, Point II, *infra*. Moreover, the best way for Mr. Davis to obtain the treatment and counseling her needs is for the Court to impose a non-incarceratory sentence, so Mr. Davis is able to continue therapy and work on addressing his mental health and addiction problems without interruption. Accordingly, he should remain outside prison, so he can remain with his supportive family, maintain his treatment, continue his gainful employment, and continue being a fully functioning and law-abiding member of society. *See* McDermott Report at 6 (noting that "Glen has tried his best during his lifetime to function in a way that is acceptable to community standards").

## DISCUSSION

### I. The Legal Standards for Sentencing

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs

sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," *i.e.*, "proportionality, deterrence, incapacitation, and rehabilitation." *Id.*; *see also, e.g., Pepper v. United States*, 562 U.S. 476, 493 (2011); *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

While the sentencing guidelines comprise one factor for this Court to consider, they are only one such factor, and "truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). Here, an individualized assessment of the record facts, the § 3553(a) factors, and application of the overarching parsimony clause that guides federal sentencing, all support the requested sentence of time served, followed by three years of supervised release with a community service requirement and special provisions related to mental health therapy and addiction treatment.

## II. The § 3553(a) Sentencing Factors Strongly Support a Non-Guidelines Sentence of Time Served, Followed By Three Years of Supervised Release

The government will likely ask for a sentence within the advisory guidelines range. If so, the government's position is misplaced. Each of the § 3553(a) sentencing factors strongly support a non-Guidelines sentence of time served, followed by three years of supervised release with a community service requirement and special provisions related to mental health therapy and addiction treatment.

As detailed above, Mr. Davis's personal characteristics and history support the requested sentence. It is evident that Mr. Davis is a good-hearted, kind, but naive person who, in the main, was taken advantage of by others, and sincerely believed the money in the Plan belonged to him. Further, a supervisory sentence will allow Mr. Davis to get the medical care, therapy, and treatment to address his marijuana addiction he desperately needs but is unlikely to adequately get in prison. Thus, this proposed sentence not only properly reflects Mr. Davis's personal characteristics, it dovetails with the sentencing goal of providing a defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner. 18 U.S.C. 3553(a)(2).

Likewise, the requested sentence will "punish" Mr. Davis. Three years of supervised release "is not merely 'letting an offender off easily.'" *Gall v. United States*, 552 U.S. 38 (2007). As the United States Supreme Court expressly has recognized, supervised release involves "substantial restrictions on freedom" that effectively deters and punishes in its own right. *Id.*

The sentencing goals of specific and general deterrence also support the requested sentence. As to specific deterrence, there is no question that Mr. Davis has learned his lesson here. Despite the challenges he faced growing up, Mr. Davis has led a law-abiding, and in many ways exemplary, life, filled with acts of kindness and charity. *See* PSR ¶¶ 202-207; Background discussion, *supra*. There is no reason to think that a jail term is needed to deter him from further wrongdoing.

| | |
|---|---|
| Hon. Valerie E. Caproni | April 25, 2024 |
| Judge, Southern District of New York | Page 12 |

Re: *United States v. Davis*, 21 Cr. 603 (VEC)

The requested non-guidelines sentence of three years supervised release also will generally deter others who are considering making the same mistake as Mr. Davos. Studies have shown that it is the arrest that best deters, not the length of the sentence. *See, e.g.*, Valerie Wright, The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, 5-6 (2010), http://www.sentencingproject.org/wp-content/uploads /2016/01/ Deterrence-in-Criminal-Justice.pdf. Here, the arrest of Mr. Davis and the other former NBA players has been highly publicized and anyone who is thinking of defrauding a benefits plan has seen what has happened here and is deterred. Certainly, there is no evidence that, under these circumstances, prison time will provide any greater specific or general deterrence. Accordingly, the parsimony principle underlying federal sentencing supports the supervisory sentence requested, because it is sufficient, but not greater than necessary to deter Mr. Davis and others.

As to rehabilitation, the government will likely argue that the sentence should be greater for Mr. Davis than for the similarly-situated co-defendants, who generally received time served and three years of supervised release as their sentence, because Mr. Davis chose to hold the government to its proof, and did not demonstrate rehabilitation by pleading. Any such argument is incorrect, however, and should be rejected by the Court.

It is improper to base a sentence, or augment it, because the defendant decided to proceed to trial. *United States v. Platt*, 715 Fed. Appx. 80, 82 (2d Cir. 2018); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("punish[ing] a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"); *accord State v. Boone*, 239 S.E. 2d 459, 465 (N.C. 1977) ("No other right of the individual has been so zealously guarded over the years and so deeply embedded in our system of jurisprudence as an accused's right to a jury trial. This right ought not to be denied or abridged nor should the attempt to exercise this right impose upon the defendant an additional penalty or enlargement of his sentence."). Try as it might, the government cannot properly circumvent this basic prohibition by shoehorning this augmentation into the "rehabilitation" sentencing goal. In this regard, Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added). Here, correction and rehabilitation can best be addressed not by incarceration, but by making sure that, as a condition of his supervised release, Mr. Davis receives the substance abuse and mental health treatment he needs and cannot get while incarcerated, so he can develop the confidence, life skills, and coping mechanisms that will allow him to more readily avoid the same type of situation in the future.

Finally, even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). The cruel nature of prisons have beem exacerbated by the general breakdown of the prison system that began with the pandemic but has not ended. The terrible prison conditions that remain extant throughout the Bureau of Prisons provides another strong reason for imposing the non-guidelines sentence Mr. Davis requests here. This is particularly true, given Mr. Davis's diabetes and sports-related injuries that require a consistent level of palliative care that does not really exist behind bars. *See, e.g., Diabetes behind bars, supra*, recognizing that "despite the existence of diabetes management guidelines from the Federal Bureau of Prisons, provision of such care is highly variable and often lacking").

Hon. Valerie E. Caproni  April 25, 2024
Judge, Southern District of New York  Page 13

Re: *United States v. Davis*, 21 Cr. 603 (VEC)

## CONCLUSION

An individualized assessment of the § 3553(a) factors in this case (and the parsimony principle) strongly support a non-Guidelines sentence of time served and three years of supervised release with a community service requirement and special provisions related to mental health therapy and addiction treatment. Accordingly, Mr. Davis respectfully requests that the Court impose that sentence upon him.

                                                Respectfully submitted,

                                                /s/ Sabrina Shroff
                                            Counsel to Ronald Glen Davis

SPS/
Exhibits

cc: All counsel of record (by ECF)