

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG
May 2, 2022

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 1, 2022

To: All Counsel

**Re:**    *United States v. Williams, et al.* **21 Cr. 603 (VEC)**

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the information below.

On or about August 7, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Dr. Patrick Khaziran of Advanced Chiropractic and Rehab Center ("ACRC"). The case team has since learned that during the August 7, 2019 interview, Dr. Khaziran made the following statements, in substance and in part: (i) Dr. Khaziran routinely treats current and former athletes (including from the NBA) and their families; (ii) Dr. Khaziran charges $1,000/day regardless of how long a patient is at ACRC or the number of services rendered to the patient, although on occasion, if a patient leaves the facility early, charges may be less than $1,000; (iii) Dr. Khaziran treated 52 of 60 NBA players, on a list of players provided to him by the interviewers, and does not recall treating the following players: Alan Anderson, Anthony (Tony) Allen, Antoine Wright, Charles Watson Jr., Ronald Glen Davis (may have seen at some time), Shannon Brown (does not believe he is a patient but name is familiar), Sebastian Telfair (not a patient but treated his wife); and (iv) Dr. Khaziran reviewed letters of medical necessity and suggested that there were issues with the letters—insofar as the signatures did not appear to be authentic and the language contained in the letters was unusual—and could not confirm that they were his letters.

On or about December 9, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Anthony ("Tony") Allen. The case team has since learned that during the December 9, 2019 interview, Allen made the following statements, in substance and in part: (i) Allen received a letter seeking further verification; and (ii) Allen would do what he can to repay the money.  According to the non-law enforcement individuals who conducted this interview, this interview was conducted over Skype and lasted about ten minutes or less at night.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Ronald Glen Davis. The case team has since learned that during the December 10, 2019 interview, Davis made the following statements, in substance and in part: (i) Davis did not misuse his healthcare reimbursement account; (ii) Davis had some concern that his identity had been stolen; (iii) Davis

did not submit reimbursement claims for "Dr. Pat" and Dr. Wahab; and (iv) Davis did not submit a letter of medical necessity. According to the non-law enforcement individuals who conducted this interview, this interview was conducted while Davis was in his car on the phone and was somewhat distracted.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Charles ("C.J.") Watson Jr.. This case team has since learned that during the December 10, 2019 interview, Watson Jr. made the following statements, in substance and in part: (i) Watson Jr. did not engage in any wrongdoing regarding his healthcare reimbursement account; (ii) Watson Jr. was aware of a conversation at the Big 3 tournament regarding being entitled to funds in individuals' HRA funds; (iii) Watson Jr. submitted reimbursements; and (iv) Watson Jr. he received services in Seattle.

On or about January 19, 2022, the National Basketball Association Players' Health and Welfare Benefit Plan (the "Plan"), through counsel, informed the case team that the Plan takes "no position" as to whether or not the Plan is a victim of the conduct charged in the Indictment in this case.

On January 5, 2022, the discovery coordinator questioned the Government, with respect to the December 8, 2021 production, why certain .eml files in folder "02. 2703(d)\Apple\20 MAG 6032" (the "Folder") contain no subject or email body. The .eml files contained with the Folder were produced to the defendants in the form they were received from Apple. Further, because the Folder contains returns from an order issued pursuant to 18 U.S.C. § 2703(d), they should not contain content. When a paralegal working on this case examined the Folder in response to the discovery coordinator's January 5 query, they observed that at least two of the .eml files in the Folder appeared to have content. To the extent that .eml files in the Folder contain content information, the Government did not rely on that content in investigating and charging this case, and will not rely on any such content information moving forward.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612

06.20.2018

Received by GLG via Email
February 3, 2022

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

CDA note: This
supplemental letter was
originally received on
2/1/22. This revised
letter was received on
2/3/22 to correct a typo.
It includes a response to
the CDA's inquiry
regarding blank EML files
located in Production
12.8.21.

February 3, 2022

To: All Counsel

**Re:   *United States v. Williams, et al.* 21 Cr. 603 (VEC)**

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the information below.

On or about August 7, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Dr. Patrick Khaziran of Advanced Chiropractic and Rehab Center ("ACRC"). The case team has since learned that during the August 7, 2019 interview, Dr. Khaziran made the following statements, in substance and in part: (i) Dr. Khaziran routinely treats current and former athletes (including from the NBA) and their families; (ii) Dr. Khaziran charges $1,000/day regardless of how long a patient is at ACRC or the number of services rendered to the patient, although on occasion, if a patient leaves the facility early, charges may be less than $1,000; (iii) Dr. Khaziran treated 52 of 60 NBA players, on a list of players provided to him by the interviewers, and does not recall treating the following players: Alan Anderson, Anthony (Tony) Allen, Antoine Wright, Charles Watson Jr., Ronald Glen Davis (may have seen at some time), Shannon Brown (does not believe he is a patient but name is familiar), Sebastian Telfair (not a patient but treated his wife); and (iv) Dr. Khaziran reviewed letters of medical necessity and suggested that there were issues with the letters—insofar as the signatures did not appear to be authentic and the language contained in the letters was unusual— and could not confirm that they were his letters.

On or about December 9, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Anthony ("Tony") Allen. The case team has since learned that during the December 9, 2019 interview, Allen made the following statements, in substance and in part: (i) Allen received a letter seeking further verification; and (ii) Allen would do what he can to repay the money.  According to the non-law enforcement individuals who conducted this interview, this interview was conducted over Skype and lasted about ten minutes or less at night.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Ronald Glen Davis. The case team has since learned that during the December 10, 2019 interview, Davis made the following statements, in substance and in part: (i) Davis did not misuse his healthcare reimbursement account; (ii) Davis had some concern that his identity had been stolen; (iii) Davis

did not submit reimbursement claims for "Dr. Pat" and Dr. Wahab; and (iv) Davis did not submit a letter of medical necessity.  According to the non-law enforcement individuals who conducted this interview, this interview was conducted while Davis was in his car on the phone and was somewhat distracted.

On or about December 10, 2019, individuals who are not in law enforcement, and who were not acting at law enforcement's direction, conducted an interview of Charles ("C.J.") Watson Jr..  This case team has since learned that during the December 10, 2019 interview, Watson Jr. made the following statements, in substance and in part: (i) Watson Jr. did not engage in any wrongdoing regarding his healthcare reimbursement account; (ii) Watson Jr. was aware of a conversation at the Big 3 tournament regarding being entitled to funds in individuals' HRA funds; (iii) Watson Jr. submitted reimbursements; and (iv) Watson Jr. received services in Seattle.

On or about January 19, 2022, the National Basketball Association Players' Health and Welfare Benefit Plan (the "Plan"), through counsel, informed the case team that the Plan takes "no position" as to whether or not the Plan is a victim of the conduct charged in the Indictment in this case.

On January 5, 2022, the discovery coordinator questioned the Government, with respect to the December 8, 2021 production, why certain .eml files in folder "02. 2703(d)\Apple\20 MAG 6032" (the "Folder") contain no subject or email body.  The .eml files contained with the Folder were produced to the defendants in the form they were received from Apple.  Further, because the Folder contains returns from an order issued pursuant to 18 U.S.C. § 2703(d), they should not contain content.  When a paralegal working on this case examined the Folder in response to the discovery coordinator's January 5 query, they observed that at least two of the .eml files in the Folder appeared to have content.  To the extent that .eml files in the Folder contain content information, the Government did not rely on that content in investigating and charging this case, and will not rely on any such content information moving forward.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing.  **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney


by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG
May 2, 2022

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 25, 2022

**By Email**
Matthew Laroche
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
(212) 530-5000
mlaroche@milbank.com

Re:   ***United States v. Williams, et al.*** **21 Cr. 603 (VEC)**

Dear Mr. Laroche:

The Government writes in response to the February 15, 2022 letter (the "Letter") sent by certain defendants in the above-captioned case (the "Defendants").

*First*, in their Letter, the Defendants pose several questions about the interviews conducted by third-parties, certain summaries of which were reported to this Office and disclosed in the Government's February 1, 2022 letter.  The Government's understanding is that Plan counsel conducted the interviews, but the Government does not know the identity of all of the individuals who participated in, or conducted, the interviews.  The Government first learned of Plan counsel's interviews after they occurred.  The Government did not direct that Plan counsel's interviews occur, nor did the Government or the FBI participate in Plan counsel's interviews.  Plan counsel Hadassa Waxman from Proskauer Rose LLP and Samidh Guha from Perry Guha LLP provided information about the interviews to the Office and FBI during meetings on January 22, 2020 and February 27, 2020.

As the Government did not participate in the interviews, the Government did not record or memorialize them.  Instead, the Government and/or FBI agents took notes of Plan counsel's summaries of their interviews during the above-described meetings on January 22, 2020 and February 27, 2020, and provided the substance of those notes in its February 1, 2022 disclosure letter.  The Government is now producing notes from its January 22, 2020 and February 27, 2020 meetings with Plan counsel pertaining to Plan counsel's summaries of its interviews with particular Defendants and other relevant individuals.  Those notes are attached.  With respect to whether the summaries of the interviews were used to support any process sought by the Government, the Government refers Defendants to the affidavits and process in this case, which were previously produced to the Defendants in discovery.  The Government did not reference Plan counsel's interviews in the Grand Jury.  The Government reserves the right to introduce at trial certain statements made by the Defendants during Plan counsel's interviews.  The Government is not aware of any obligation precluding it from doing so, or for that matter, any reason it would be

precluded from relying on statements made during the interviews in legal process or the Grand Jury.

*Second*, the Defendants pose several questions about the Plan's statement that it takes "no position" as to whether it is a victim in this case. Ms. Waxman, on behalf of the Plan, made the statement during a January 19, 2022 call with the Government. Participants on that call were Samidh Guha, Hadassa Waxman, the undersigned, and Robert Levine, who is a paralegal in the Office. The Government does not believe it has an obligation to disclose all of its communications with Plan counsel on January 19, 2022 or, as the Defendants request, "at any other time" about the charged conduct.

The Defendants also inquire about "the reason for" the January 19, 2022 communication. On December 21, 2021, during a call with Hadassa Waxman, Samidh Guha, the undersigned, and Robert Levine, notes from that call reflect that Mr. Guha stated, in substance and in part, the following: (i) "it's not the client's position that we (the HRA)[1] are the victims, it is collectively a view from the HRA that, assuming the allegations are true, it's not laudable conduct, but that the players were stealing their own money, because of the siloed nature of the accounts and because the accounts are funded based on the players' service as part of labor negotiations. This is not like HRA structures where there is a pot of money and everyone suffers. Victim is not a word we've used internally;" (ii) "to the extent that a victim is someone who could suffer as an adverse effect, then the HRA is a victim;" (iii) "as a separate point, we have heard from people that don't think of themselves as a victim;" and (iv) "your statement during the press conference about the impact on taxpayers left us scratching our heads." In addition, notes from the same December 21, 2021 call reflect that Guha was asked "whether it is was correct that teams contribute money to the Plan for legitimate medical expenses of players and their families. Not to have an additional source of income – like buying a car," and in response, Guha agreed it was "definitely not" for that purpose.[2] The Government subsequently requested clarification as to the Plan's position regarding whether it considered itself a victim of the Defendants' conduct. As indicated in our February 1, 2022 letter, Ms. Waxman and Mr. Guha, the Plan's counsel, provided the Plan's position to the Government on January 19, 2022, which has been communicated to the Defendants. Ms. Waxman and Mr. Guha, also clarified that Mr. Guha's statements were his personal opinions and not the position of the Plan.

Finally, the Government notes that it is continuing to review the materials in its possession, and will make additional disclosures to the extent required.

---

[1] The Government understands that "HRA," as used in this context, is synonymous with "the Plan."

[2] On or about June 29, 2020, notes reflect that Mr. Guha stated on a phone call, in substance and in part, that: "each player has individual account within the trust. Player X has account with trust administrator. His money on account but limits as to how it can be drawn on it. At some level taking money out of their account. They are their own victim."

This letter is marked "Confidential" under the terms of the Protective Order in this matter.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612

Copies to: All counsel

FD-1057 (Rev. 5-8-10)

UNCLASSIFIED



# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) Meet with NBA Represenetatives                **Date:** 01/23/2020

**From:** NEW YORK
       NY-C8
       **Contact:** Richard L. Prince, █████████

**Approved By:** SSA KANG HYO TONG

**Drafted By:** Richard L. Prince

██████ ████████ ███████

█████ ████████████████████

**Details:**

    On January 22, 2019, National Basketball Association (NBA), Health Reimbursement Accounts (HRA) representatives- Attorney Samidh Guha from Perry Guha LLP, Attorneys Hadassa Waxman, Danielle Moss, and Jacob Tucker from Proskauer LLP, Assistant United States Attorneys (AUSA) Kristy Greenberg, Timothy Howard, and Ian McGinley of the Southern District of New York (SDNY), Supervisory Special Agent Hyo Kang, Special Agents (SA) Jonathan D Eng, and Richard L. Prince met at SDNY ███████████████ ████████████████████████████████████████████.

████████████████████████████████████
████████████████████████████████████
████████████████████████████

UNCLASSIFIED

CONFIDENTIAL

**UNCLASSIFIED**

```
Title:  (U) Meet with NBA Represenetatives
Re:  209B-NY-3213610, 01/23/2020
```

◆◆

CONFIDENTIAL





Tony Allen

③

Glen Davis —

Sipohe to him) claim

ID Theft

@ interew. Received Series in Seattle (US in BH).

Terence Williams — Said hold conf, no longer

CONFIDENTIAL

01/22/20    Samson, Danelle von, Jake Osler,
                          └───┬───┘
                         Prosheren



※ Aror Wakal ※ ———

• decision to verify — (CJ Watson (200k)



CT Watson

— Interview — Seattle

Proskauer - representing
NBA

Tossed
Records
- Pre 2018

↳ Patt Chazerin - Aug/2019 interviewed

↳ Amir Watad - contacted Aug/2019
  ↳ would not verify claims
     for ① person

CONFIDENTIAL

- 1 of 5 -

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    04/21/2020

    On February 27, 2020, Hadassa Waxman, Attorney for Proskauer LLP was
interviewed at the Southern District of New York (SDNY), 1 St. Andrew's
Plaza, New York, NY.  Present for the interview was Special Agent Richard L.
Prince, National Basketball Association (NBA), Health Reimbursement Accounts
(HRA) representatives- Attorney Samidh Guha from Perry Guha LLP,
Attorneys Danielle Moss, and Jacob Tucker, from Proskauer LLP, and Assistant
United States Attorneys (AUSA) Kristy Greenberg and Ryan Finkel of SDNY.
Waxman provided the following information:



    Dr. Patrick Khaziran from Advanced Chiropractic and Rehabilitation
Center (ACRC) was interviewed on August 7, 2019.  The ACRC was later re-
named Sports Rehabilitation LA).  Khaziran reported that he routinely treats
current and former athletes from the National Football League, the National
Hockey League, and the NBA, along with other professional athletes and their
families.  Khaziran charges clients $1000 per day regardless of how long
client is at the facility or how many services the client receives.

---

Investigation on  02/27/2020  at  New York, New York, United States (In Person)

File #  209B-NY-3213610-302                          Date drafted  03/03/2020

by  Richard L. Prince

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

CONFIDENTIAL

209B-NY-3213610-302

Continuation of FD-302 of  (U) Proskauer                                    , On  02/27/2020  , Page   2 of 5

Khaziran advised that the facility closely mimics a team environment and
that clients can be there from two to five hours.  On occasion, if a player
leaves the facility early, charges to the client can be less than the usual
$1000.  The facility also has charges for shakes, nutritional substances,
etc. that can be $20 or $30.  The rehabilitation facility accepts various
methods of payments, including workers compensation, Signa, HRA debit cards,
and, on occasion, cash.  The facility will only provide invoices on request.

Khaziran confirmed that he treated 52 of 60 NBA players. Another one of
the 60 players seems to only have purchased elastic bands and shakes.
Khaziran reported that all records, pre-dating May, 2018 were lost.
Khaziran advised that he does not recall treating the following individuals:
Allen Anderson, Anthony (Tony) Allen, Antwane Wright, Charles Watson Jr.
(CJ), Ronald Glenn Davis, Shannon Brown, and Sebastian Telfair.
Khaziran expressed that he may have seen Davis at some time.  Khaziran also
expressed that he does not believe Brown to be a patient but, Brown's name
sounds familiar.  In addition, Khaziran reported that Telfair is not a
patient but Khaziran treated his wife.

(Note: Notes for this interview were continued via typing on a laptop by
AUSA Ryan Finkel.  After reviewing the notes that were typed by AUSA Finkel,
SA Prince has adopted the notes as his own.)

Khaziran reviewed Letters of Medical Necessity (LMN) that appeared to
have his signature.  Khaziran expressed that there were issues with the
letters.  He could not confirm that they were his letters.
Khaziran suggested that the signatures looked off and the language in the
letters was unusual.

Waxman expressed that the number of people treated by Khaziran was
learned during a follow-up call to Khaziran.

Dr. Amir Wahab is a dentist from Unforgettable Smile, Wahab Dental
Corporation, Aesthetic Implant Dentistry of Beverly Hills.  Wahab declined
to be interviewed by Proskauer representatives.



CONFIDENTIAL

209B-NY-3213610-302

Continuation of FD-302 of  (U) Proskauer _____ , On  02/27/2020 , Page  4 of 5



Tony Allen was interviewed on December 9, 2019.  The interview was at night and only lasted about 10 minutes or less.  Allen received a letter seeking further verification and then explained that he would do what he can to repay the money. ████████████████████████████████████ The interview was distracted due to it being conducted over Skype.

CJ Watson was interviewed on December 10, 2019.  Watson denied any wrong doing and expressed that he was aware of a conversation that took place at the Big 3 tournament regarding players being entitled to funds in individual HRA fund accounts.  Watson expressed that he put in for reimbursements. ████████████████████████████████

Glenn Davis was interviewed on December 10, 2019.  The interview was via telephone while Davis was in a car and was somewhat distracted.  Davis denied any misuse of accounts and expressed concern regarding his identity being stolen.  Davis further denied making claims for reimbursement for services from Dr. Khaziran, and Dr. Wahab.  Davis also denied submitting LMNs. ████████████████████████████████████████

CONFIDENTIAL

209B-NY-3213610-302

Continuation of FD-302 of  (U) Proskauer _____ , On  02/27/2020  , Page  5 of 5

CONFIDENTIAL

2/27/2020

Pg 7, 2019 - interviews
Doc. Patrick Khaziran - Advanced Chiro & Rehab Center
(Then Changed to Sports Rehab LA)

Routinely treats current & former athletes from GH NFL/
NBA/NHL & other Pro Athletes + their families.
$1,000./day regardless of how long there, or # of svcs.
Environment closely mimics team environment
There bet. 2+5 hrs.
On occasion, if player left facility early, charges
may be less than $1000.
Charges for $20 or $30 are for Shakes, & nutritional
substances, etc.
Accepts various methods of pymts. - Workers comp, SIGNA,
HRA debit cards, occasionaly accepts cash.

CONFIDENTIAL

- Only provides invoices on request.
Confirmed that he treated 52 of 60 NBA Players
One of the 60 seems to have purchased Plastic bands,
Shakes.

All records pre-dating May/2018 were lost.

Does not recall treating:
~~Did not see~~: Allen Anderson, Anthony (Tony) Allen,
Antwan Wright
Charles Watson Jr. (GJ)
Ronald Glenn Davis - may have see at
some time.

Shannon Brown. Does not believe he is a
patient but name is familiar

Sebastian Telfair - not a patient but
treated his wife

- Notes continued by Ausa Ryan Finkel via typing. After reviewing
notes typed by Ryan Finkel I have adopted as my own. RLF

CONFIDENTIAL

Dr. Patrick continued.

Dr. reviewed letters of medical necessity (LMN) he suggested that were issues with the letters, could nto confirm they were his letters.  Signatures looked off, language was unusual.

Follow-up calls with Dr. Patrick.  The 53 number from a follow-up call.


**Dr. Amir Wahab**. Unforgettable Smile, Wahab Dental corporation, Athestic implant Denstirsty of Beverly Hills.

Interviews attempted by PK, he declined to talk. ████████████████████

████████████████████  (no intv with PK)

████████████████████

████████



**Tony Allen** – 12/9/19

Spoke about 10m or less, at night, he had received letter seeking further verification.

He said he would do what he can repay the money. ████████████████████

████████████████████

(PK Note: conversation was distracted over Skype)

**CJ Watson – 12/10/19**

Denied any wrong doing.  Awareness of conversation at Big 3 tournament re: entitled to funds in individual funds in HRAs.  Stated put in reimbursements ████████████

**Glenn Davis 12/10/19**

(PK note, spoke on phone whil in car and somewhat distracted)

Stated denied misue of account, had some conern his identity had been stolen.  Denied claims to reimbursement to Dr. Pat, Dr. Wahab and denied putting in LMN.

████████████████████████████

████████████████████

CONFIDENTIAL



**U.S. Department of Justice**

Received by GLG
May 2, 2022

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 25, 2022

To: All Counsel

    **Re:**   ***United States v. Williams, et al.* 21 Cr. 603 (VEC)**

Dear Counsel:

    The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information.

    In July 2020, Veronica Batt, an employee of Pro-Flex Administrators LLC ("Pro-Flex"), who worked on the NBA Players' Health and Welfare Benefit Plan's (the "Plan") account, stated to the Government, in substance and in part, that:   Batt did not see anything unusual regarding Unforgettable Smile invoices.  Batt spoke with Jennifer Greene [a Pro-Flex colleague] about Unforgettable Smile.  It was under a microscope because there was suspicion that services were not being rendered.  When trying to validate services from Unforgettable Smile, they were unable to validate the services.

    In July 2020, Jennifer Green, an employee of Pro-Flex, who worked on the Plan's account, stated to the Government, in substance and in part, that:  while working at Pro-Flex and answering calls as part of her daily responsibilities, Green spoke with Ronald Glen Davis on November 13, 2019.  The two discussed a claim from Unforgettable Smile for Davis, which he denied.  Green recalled being dumbfounded when Davis claimed that Williams took his personal information.

    In July 2020, Jennifer Moore, an employee of Pro-Flex, who worked on the Plan's account, stated to the Government, in substance and in part, that: (i) Pro-Flex employees would provide information to the caller believed to be Williams, but pretending to be Davis, because they had no reason not to provide the information after the security questions were answered correctly.  Moore asked her team to start noting when the caller ID would display Terrence Williams's name.  Moore also recalled instances when the Pro-Flex team would receive calls from two different voices on the same day and asking the same questions.  There were also instances when the caller, believed to be Williams, would provide an alternate call-back phone number.  The first question Pro-Flex employees ask when answering the phone is "may I have your name?"  The caller, believed to be Williams, would respond with Davis's name, and never identified himself as Williams to Pro-Flex employees.  Once the team noticed the trend and Moore was made aware, the team documented the inbound telephone numbers.  At least as of June 26, 2019, if the caller ID showed up as Williams, Pro-Flex staff would make note of the occurrence; and (ii) the caller believed to be the real Davis was described as much nicer, softer spoken, and understood that it took time for claims to be processed. The caller believed to be Williams was described as agitated, abrupt, and

06.20.2018

impatient.  There are entries in the "NBA Contact Log" where the member calling could in fact be Williams.  Batt, Green, Moore, and Pro-Flex are represented by Jennifer Collesano of Rupp, Baase, Pfalzgraf, Cunningham LLC.

The Government is producing today notes from conversations with Dolores A. Cottrell, DDS, MSHA; Dr. Asgeir Sigurdsson, DDS, MS, both of whom the Government consulted as potential expert witnesses.  Also produced today are conversations with counsel from Wells Fargo.

On or about October 7, 2021, and October 11, 2021, an individual ("Individual-1") who prepared invoices for Advanced Chiropractic and Rehab Center ("ACRC") stated to law enforcement officers, in substance and in part, that Individual-1 understood that ACRC had NBA players, athletes, and famous people as clients.  Individual-1 is represented by Zachary Margulis-Ohnuma.

On or about October 7, 2021 and December 17, 2021, an individual ("Individual-2") who once worked at Unforgettable Smile stated the following, in substance and in part:  (i) for celebrities, it was normal to have a 'middle man' to communicate with and send documents to; (ii) it felt odd sending patient treatment plans to anyone other than the patient; (iii) Individual-2 was asked to create fake invoices by Wahab, and created the fake invoices.  Wahab stated the invoices were for his celebrity patients whom he made prior arrangements with; (iv) Individual-2 contradicted their previous statements and stated they never made fake invoices for Wahab; and (v) defendant Terrence Williams received dental services to include crowns and sedation performed by Wahab.  Individual-2 is represented by Ryne Thomas Sandel of the Whalen Law Office.

On or about October 7, 2021, an individual ("Individual-3") who worked at Innovative Men's Clinic stated to law enforcement officers, in substance and in part, that (i) Individual-3  did not create patient invoices unless Individual-3 met with the patient; (ii) Individual-3 was never advised by Dr. Washington to create an invoice or receipt without seeing the patient first; (iii) sometimes Dr. Washington instructed Individual-3 to bill patients without ever seeing the patient; and (iv) sometimes Dr. Washington called Individual-3 and instructed Individual-3 to bill patients without Indiviudal-3 ever seeing the patient.  Individual-3 would manually enter the credit card information and charge it for the amount directed by Dr. Washington.  The signature line of the receipt stated Signature Verified.  Individual-3 advised this replaced the patient's signature, which had been approved by Dr. Washington.  Individual-3 felt it was odd but did as instructed.  Individual-3 later revised his statement and stated that Dr. Washington only asked Individual-3 to produce a receipt in connection to this one incident.  Individual-3 is represented by Harvey Fishbein.

In conversations with the Government, a second individual ("Individual-4") who worked at Innovative Men's Clinic stated to law enforcement officers, in substance and in part that (i) Ely and Palacio were provided sports injury treatments, which are outside IMC's core business.  Ely and Palacio are "on the side" patients that were treated as VIPs by Dr. Washington; (ii) Ely and Palacio were IMC patients for approximately two years; (iii) Dr. Washington must have been tricked into doing something wrong and is not business savvy; (iv) Individual-4 is not aware that Dr. Washington was committing fraud; and (v) Individual-4 did not see anything wrong with

charges for Ely and Palacio's services after IMC's accounting firm approved and because the charges were "going through."  Individual-4 is represented by Jeffrey Setness of Fabian Van Cott.

In conversations with the Government, the individual identified as CC-1 in the Indictment stated the following, in substance and in part: (i) Williams also used cellphone numbers 206-483-7188 and 206-775-1740; (ii) CC-1 did not recall Williams giving CC-1 the name Greg Smith, specifically.  CC-1 further advised that Williams likely gave CC-1 this name because these invoices look like the other invoices in CC-1's email account; (iii) CC-1 did not recall the name Antione Wright; (iv) Williams received dental services from Unforgettable Smile.  CC-1 is represented by Marisa Cabrera of the Federal Defenders of New York.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing.  **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.  Its attachments are marked "Confidential."**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
    Kristy J. Greenberg
    Ryan B. Finkel
    Assistant United States Attorneys
    (212) 637-2469/6612

06.20.2018

| | |
|---|---|
| **From:** | Steven.A.Kay@wellsfargo.com |
| **To:** | Finkel, Ryan (USANYS) |
| **Cc:** | Vega, Lisa (NY) (FBI) |
| **Subject:** | CST - NBA Players" Health and Welfare Benefit - WF2021024146 |
| **Attachments:** | image001.png |

Review of Docs

How are wires and checks processed

After processed is there a transmittal showing the records/account is current

Where are the servers located

If deposited into a non WF account is this the same process

Steven A. Kay

Paralegal – Complex Subpoena Team
Wells Fargo Legal Department

Litigation Regulatory Enforcement & Investigations | Enterprise Litigation and Legal Order Processing Team

Two Wells Fargo Center | 301 South Tryon Street, 11th Floor | Charlotte, NC 28282-1915

MAC: D1130-117| Tel 704-383-0154| Fax: 866-870-3592

Steven.A.Kay@wellsfargo.com <mailto:Steven.A.Kay@wellsfargo.com>

CONFIDENTIALITY NOTE: The contents of this message may be a confidential attorney/client communication, confidential attorney work product, or a confidential communication of proprietary information. If you are not the intended recipient, please destroy

CONFIDENTIAL

and notify the sender.

CONFIDENTIAL

| | |
|---|---|
| **From:** | Finkel, Ryan (USANYS) |
| **To:** | Coughlin, Michael Francis (NY) (FBI) |
| **Cc:** | Finkel, Ryan (USANYS) |
| **Subject:** | 2021-7-27 Call with McCray (Wells Fargo) |
| **Date:** | Tuesday, July 27, 2021 5:00:45 PM |

Call with Felicia McCray

TCP/IP addresses is closest thing to physical location, which have been ordered.
That will provide the pathway if things are online or not.
Not sure what address in Wire Transaction Report
Suggested follow up call on Friday

--
Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-6612
Ryan.Finkel@usdoj.gov

CONFIDENTIAL

| | |
|---|---|
| **From:** | Finkel, Ryan (USANYS) |
| **To:** | Eng, Jonathan D. (NY) (FBI); Coughlin, Michael Francis (NY) (FBI); Vega, Lisa (NY) (FBI) |
| **Cc:** | Greenberg, Kristy (USANYS) |
| **Subject:** | 2021/8/9 F. McCray Call (Wells Fargo) |
| **Date:** | Monday, August 9, 2021 11:47:00 AM |

2021/8/9 F. McCray Call (Wells Fargo)

Submitted to conflicts subpoena team, they should be almost done.
Asked for extension to August 11.
I requested an update before agreeing to August 11 date, noted subpoena return was July 28.
Further noted if they can provide answer to first question (account location) we could then extend the second.
McCray agreed to reach out to conflicts team for update and stated she would call me later today.


--
Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-6612
Ryan.Finkel@usdoj.gov

CONFIDENTIAL

**From:**      Finkel, Ryan (USANYS)
**To:**            Greenberg, Kristy (USANYS); Eng, Jonathan D. (NY) (FBI); Coughlin, Michael Francis (NY) (FBI); Rusuloj, George Junior (NY) (FBI)
**Cc:**        Vega, Lisa (NY) (FBI); Finkel, Ryan (USANYS)
**Subject:**   2021/9/1 - Call with Wells Fargo re: July 15 subpoena
**Date:**      Wednesday, September 1, 2021 12:39:17 PM

Wells Fargo – Steve Kay, Paralegal, from legal

R Finkel

L Vega

-8799 is Wells One account, was sent to another department for information.  Just a checking a account.  Records are more limited.  Check images and statements are still outstanding.
- Check deposited into 4490 on may 24, 2018 at a branch in GA, went to server in sureview MN, posted to customers account in deposit.  Account opened in 2005.  Waiting on branch information.
- 3314, NBA player health and wealthfare was initially opened in NY.
- Signature card would be branch were the account was opened.  Once the account is opened understands there is no housing location could be any location but the location of account opening is associated with account.
- Wires and such go to certain serves and certain areas.
- PDF will show signature card.
- Excel will show the check movements.
- Not sure why wires have incoming addresses in NYC.  Not his department.
- Accounts do not have physical locations but were associated with the branch at which they were opened.
- Wells Fargo has only a couple server locations: MN, California and one or two more.  Not sure what the server location means, thinks it is a hub. And understands servers would transmit information to the branch in where account is associated to keep its records current.
- Will confirm all this and circle back for call on Friday.
- Records will be sent today or tomorrow.


--

Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-6612
Ryan.Finkel@usdoj.gov

CONFIDENTIAL

| | |
|---|---|
| **From:** | Kenneth Rudd |
| **To:** | Finkel, Ryan (USANYS) |
| **Cc:** | David B. Chenkin |
| **Subject:** | [EXTERNAL] RE: GJS to Wells Fargo Bank, N.A. |
| **Date:** | Friday, September 17, 2021 5:59:22 PM |
| **Attachments:** | image001.jpg |

Ryan-

We are continuing to dig, but I have more information.

As of July of 2021, the Bank implemented a new process.  As of then, the account's Responsible Accounting Unit (RAU) was "Greater Manhattan and Long Island."  And the RAU is as I described it on the phone.  Plus, the customer's address is in NY.

Prior to July 2021, the RM was in was in Boston, MA.  (It is not unusual for a Relationship Manager / team to be in a separate geography from the customer).  Accounting, profit and loss and risk management would have been handled in Boston.

We are trying to find out any server information that may further affect your inquiry.  We are also looking for the applicable account agreement that may also affect the domicile analysis, as it may reference the customer's location.

As to the Check, as discussed, it was drawn on the account at issue and was deposited in Georgia to the credit of a WF account.  A server that processed that transaction in in MN.  I am trying to dig down to other detail about the location of systems involved in processing the check, crediting the depositor's account and debiting the drawer's.

We'll keep you informed.

Thanks and have a nice weekend.

Ken

**From:** Kenneth Rudd
**Sent:** Tuesday, September 14, 2021 6:58 PM
**To:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

I accepted the invitation, so yes.

Looking forward.

CONFIDENTIAL

Ken

**From:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Sent:** Tuesday, September 14, 2021 5:13 PM
**To:** Kenneth Rudd <KRUDD@zeklaw.com>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Sorry, just saw this.  Does 11 still work?

**From:** Kenneth Rudd <KRUDD@zeklaw.com>
**Sent:** Tuesday, September 14, 2021 3:16 PM
**To:** Finkel, Ryan (USANYS) <RFinkel@usa.doj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Hi Ryan,

I can speak today till 4:30 and after 5:00 and tomorrow 11:00 – noon and 1:00 – 3:30.  Let me know what works.

Ken

**From:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Sent:** Monday, September 13, 2021 2:04 PM
**To:** Kenneth Rudd <KRUDD@zeklaw.com>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Thanks for this.  From January 1, 2016 through present is the time frame we are interested in.

For that check, if the account was in New York at some point I would want to understand how the check interacted with New York.

Let me know when is best to discuss these issues.

Thank you,

Ryan

**From:** Kenneth Rudd <KRUDD@zeklaw.com>
**Sent:** Monday, September 13, 2021 2:02 PM
**To:** Finkel, Ryan (USANYS) <RFinkel@usa.doj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>

CONFIDENTIAL

**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Ryan-

I had a good call with some SMEs this morning.  Here's a quick update:

1.  As to the location of the account, as of earlier this year it was definitely New York, and I can explain what that means when we speak,.  But, as I'm sure you're not just interested in the *current* status, but want to know historically, please let me know the time period you're interested in.  It's possible that the location (for accounting, risk) etc. purposes may have moved, so while folks are looking for historical records, knowing the time frame will help focus them.

2.  As to the processing of the particular check, it was deposited at a branch in Georgia and at least somewhat processed at a server in MN, but I'm looking for more detail.  Let me know if that will be enough for you and I can stand down on that issue.

Thanks,

Ken

**From:** Kenneth Rudd
**Sent:** Friday, September 10, 2021 2:51 PM
**To:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Ryan,

We are making substantial progress on the priority issues and are speaking with client folks, whom we think are the right subject matter experts, on Monday.

We therefore expect to get back to you at the beginning of the week.

Wells Fargo is having trouble locating the account ending 799 at any WF entity so that we can tell you which entity to serve.  It found a possible account, in the name of a natural person, but so far indicators are that it closed in 2007 or 2008, so I'm not at all optimistic that's the one you're looking for.  Can you provide some information about how you identified that account to help WF help you?

Thanks!

Ken

**From:** Kenneth Rudd
**Sent:** Wednesday, September 08, 2021 7:39 PM

CONFIDENTIAL

**To:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Thanks, Ryan.  We're working on the open issues, including tracking down the proper name of the other WF entity.

We are authorized to accept service of the subpoena to the Bank returnable 9/15.

Regards,

Ken

---

**From:** Finkel, Ryan (USANYS) <Ryan.Finkel@usdoj.gov>
**Sent:** Tuesday, September 07, 2021 4:22 PM
**To:** Kenneth Rudd <KRUDD@zeklaw.com>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** RE: GJS to Wells Fargo Bank, N.A.

Thanks, Ken.  The check is attached. The WF numbers I have are:

WF2021024146
Case No. 25435536 (no WF number that I can see)
The checks from the 3314 account appear to be referenced in the attached text file.

If you need anything else let me know.

I will re-issue the other subpoena once you provide the entity.

Thank you,

--
Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-6612
Ryan.Finkel@usdoj.gov

CONFIDENTIAL

**From:** Kenneth Rudd <KRUDD@zeklaw.com>
**Sent:** Tuesday, September 7, 2021 3:13 PM
**To:** Finkel, Ryan (USANYS) <RFinkel@usa.doj.gov>
**Cc:** David B. Chenkin <dchenkin@zeklaw.com>
**Subject:** GJS to Wells Fargo Bank, N.A.

Ryan-

It was nice to mee to you over the phone.  Thank you or your time and cooperation.

As discussed, we will work with WF to make high priority getting you information about how that one check identified on the subpoena was processed and where the account was domiciled, including what that really means.  Let me know if I misunderstood anything.

In addition, we will accept service of a GJS for a September 15 appearance, but hopefully we will be able to obviate the need for an appearance with information we expect to provide soon.

Further, we will get you information about the proper entity for account ending 799 and hopefully will advise that we are authorized to accept service.

Finally, please be so kind as to send us (1) a copy of the one check we discussed and (2) details about prior productions / GJSs served on WF.  (A list of the Bank's "WF" numbers is probably sufficient).

Thanks so much for your courtesy and cooperation.  Feel free to reach out to me or David with any issues.  The number below will reach me at my remote office.

Regards,

Ken


**Kenneth C. Rudd, Esq.**
*Partner*



1211 Avenue of the Americas
New York, New York 10036
☎ (212) 826-5355 | 📠 (212) 753-0396
✉ KRudd@zeklaw.com | www.zeklaw.com

NEW YORK | CONNECTICUT | NEW JERSEY | WASHINGTON, D.C. | TEL AVIV

CONFIDENTIAL

This transmission may contain sensitive and/or privileged information. The sender does not waive any privilege or confidentiality in the event of an inadvertent transmission to an unauthorized recipient. In the event of such a transmission, kindly contact the sender to arrange retrieval. IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

ZEK operates in Israel as Zeichner Ellman & Krause P.C.

**CAUTION:** This email originated from outside ZEK's Email System. DO NOT CLICK on any links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside ZEK's Email System. DO NOT CLICK on any links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside ZEK's Email System. DO NOT CLICK on any links or open attachments unless you recognize the sender and know the content is safe.

CONFIDENTIAL

| | |
|---|---|
| **From:** | Greenberg, Kristy (USANYS) |
| **To:** | Finkel, Ryan (USANYS); Greenberg, Kristy (USANYS) |
| **Subject:** | 9/14/21 Call with Dr. Asgeir Sigurdsson |
| **Date:** | Tuesday, September 14, 2021 2:00:45 PM |

NYU – Chairman of Endodontics, Root Canal specialty, American Board of Endodontics – a director for 6 years, 2019-2020 President

NY State – consulted with SDNY a few times (3-4 times), not testified in court, given opinions, written reports

Teach and practice dentistry

UNC – 1992, practicing and teaching since

29 years

General dentist – trained to do root canals, but endodontics – specialty in root canal (3 years of additional training)

General dentist training is less rigorous, more simple and straightforward cases – endodontics would handle more complex treatments

General dentist can acquire more training, but AAE has published guidelines of when dentist should do it and when referred to specialists

Up to each dentist to decide what they do

No specialty in cosmetic dentistry

Root canal – anterior (1 canal) – 1 or 2 appointments, molars are more complex and take multiple appointments, sometimes it takes several appointments to get rid of the infection.

General dentist advised to spend 1-2 hours for root canal per tooth is recommended, but depends on the complexity of the root canal and the issue of an infection.

Endodontists tend to be quicker

Root canals are by NY statute and most statutes have to be performed by the dentist

Pain varies: pre-diagnosis (dead so no numb, but can be extreme pain), over 90% you can anesthetize properly

Diagnosis: 50% of symptoms hold/cold sensitivities and continuous pain. Swelling is another symptom, radiographs show decay in pulp or signs of infection in the bone.

At NYU – most do consultation and then appointment. If severe pain you can act more quickly.

Average patient – not common to have multiple root canals, depends on patient – how well has patient cared for teeth

Without seeing records, but it is well known that multiple root canals can be done – not unheard

6-8 root canals in a sitting is a challenge even to me

8 root canals – depends on tooth, but it would take him 2-3 hours minimum with 30 years' experience. For general dentist, that would be very unusual and quite a challenge.

Multiple root canals –

Veneers – shell placed on front of tooth

Crown – cap around the whole tooth

Older, more likely you would need a root canal or two

Can be root canals in younger patients and can be common

Absence of trauma (decay) – poor or damaged enamel can lead to root canal, some traumatic symptoms can be rare

No rule on number of root canals performed

Endodontics are more expensive given training

CONFIDENTIAL

Tests before decide on root canal

Multiple root canals on a single date may raise a red flag – raises question on quality and standard of care, depends on what teeth are being worked on

8 root canals on a single date – wouldn't recommend for myself or the patient, lengthy session, post-operative discomfort

3-4 Anterior teeth can be done in a single date

Beyond 3-4 root canals too many things that can go wrong

Documents you would expect to find in medical files: symptoms, tests (pulp test, electro-current test, vitality tests – is tooth alive or not – part of pre-operative evaluation), pre-operative radiographs

Pre-operative consultation would typically be billed separately from the root canal

Red flag to see multiple root canals on single dates for multiple patients, including young patients

Need diagnosis of the pulp, should see X rays in the medical file

Osseous surgery – not sure, means bone

Multiple Extractions on single date not necessarily unusual with IV sedation

Occasionally patients neglected teeth so can do it as quickly as possible, rather rare and very unusual to have multiple extractions and multiple root canals on single dates with procedures in close succession due to patient discomfort and time

Extractions – depends on tooth and complexity of roots, once patient is numb actual extraction is short time (single rooted tooth can take minutes, molar with multiple roots can take more time)

Multiple root canals on a single date for molar teeth would raise a red flag

If infection, recommended to do multiple sittings

Bicuspid (8 in mouth – usually 1-2 canals – depends on radiographs) – in between anterior and molar teeth

CONFIDENTIAL

| | |
|---|---|
| **From:** | Finkel, Ryan (USANYS) |
| **To:** | Greenberg, Kristy (USANYS); Eng, Jonathan D. (NY) (FBI); Vega, Lisa (NY) (FBI) |
| **Cc:** | Finkel, Ryan (USANYS) |
| **Subject:** | 2021/9/7 Dr. Cottrell Interview |
| **Date:** | Tuesday, September 7, 2021 11:49:57 AM |

SA Vega

SA Eng

K Greenberg

R Finkel


Endodontist is a specialty is additional three years and general dentists can do it all but endodontists handle more difficult cases.

Nationwide is additional training not just NY.

Posterior teeth general would not do a lot.  Due to time it take.  Anterior tooth access is easy.

 Posterior tooth will take a little more time – 45m to 2 hours, per tooth.

Cosmetic dentistry is veneers, crowns to enhance outward appearance. May not necessarily be for medical reason just have things changed for atheistic.

Cosmetic dentistry is not a certified specialty, no dental specialty.  Across the country.

Cosmetic dentists also do general dentistry.  If someone wants to hang a shingle as a cosmetic dentist the NY Board asks for advanced education they may have had – e.g. 6 month course in veneers.  Need there be additional training for NY but not necessarily nationwide.


Cosmetic dentists could do advanced endodontic work.  But usually cosmetic dentistry is confined to what you can see – teeth 6 through 11, K9 to K9 or lower 22 – 27, lower K9 to K9.  Cosmetic dentist would be rare to do root canals.


Cosmetic dentists root canals look first at teeth numbers.  Cosmetic dentistry should by only anterior tooth.  Cosmetic dentist not surprised with 4 root canals at once if anterior teeth.  More than 4, depend on teeth numbers, if easy access.  Teeth numbers is guiding star.


Upper arch

Teeth 1 through 3 are posterior teeth – have at least four canals

4 and 5 are bicuspid have 2 to 3 canals.

6 through 11 are anterior teeth – one canal

12 and 13 bicuspids – 2 to 3 canals

14 – 16 – post terroir teeth, have four canals at least


Lower arch

17 – 19 – posterior teeth, at least four canals

20, 21 – bicuspids, 2 to 3 canals

22 – 27 – anterior teeth – one canal

28, 29 – bicuspids – 2 canal

30 – 32, posterior at least four canals.


Those with one canal performed by general dentists and cosmetic dentists.  Some general dentists

CONFIDENTIAL

do four canals.  Many general dentists do root canals it depends on features such as xray, severity of decay, drainage might send it out.  Cosmetic dentists are general dentists, not a strict specialty can do both can do general dentistry also.

If doing a lot of root canals under general anesthesia or IV sedation may do several at one time. General anesthesia need to be a oral surgeon or dental anesthesiologist – in NY.  IV sedation requires certificate for parental sedation which general dentists can get that during their residency and apply for certificate – in NY.  Enteral sedation, e.g. valium for moderate sedation, need a certificate in NY.
Not familiar with California requirements other states vary.

General anesthesia would do full mouth rehabilitation – do everything need to be done.  Cause could be in OR 3-4 hours.  General anesthesia could be in dental office.  If a general dentist and brining an anthologist in would be billed separately but if oral surgeon billed together.
Prices depend and ranges could be quite wide.

Very likely that people under the age of 40 or 30 would receive general anesthesia for full mouth rehabilitation.  Depends on patient.  Some patients might just want to  do everything at once.

Conscious sedation is IV sedation or enteral sedation.  Need to speak to dental anesthesiologist for averages for putting someone under.
Maxillofacial and oral surgery is some kind of oral surgery – could be jaw surgery.  Could be root canals.  Runs the gamut.

Hard to tell based on description if in California license says conscious sedation that they can do general anesthesia.  In NY there are separate certificates. In NY general lets you do everything less.  Each states anesthesia  laws are very different.  Been a lot of anesthesia  deaths.

Cottrell knows someone in California will ask and see if would want to speak to us.

No limit to what can be done especially if someone is under general anesthesia.

Genreal dentist do moloar and anterior teeth all the time.  Some general dentists never refer things out it depends if it is an advanced procedure.

--
Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-6612
Ryan.Finkel@usdoj.gov

CONFIDENTIAL

| | |
|---|---|
| **From:** | Finkel, Ryan (USANYS) |
| **To:** | Vega, Lisa (NY) (FBI) |
| **Subject:** | Cottrell partial notes |
| **Date:** | Monday, August 23, 2021 10:24:00 AM |

Endodontic therapy

Socio-economic class

Age, preventive car

Could be any age

Anterior teeth – can be four root canals

Depends on where teeth are

Molar teeth is more involved

If patient is under sedation or in hospital because can do all 8 at once.

Would see IV sedation or general anthesia

General anethesia not done in general detist office – could be oral surgery offices

General anethesia, general anthesiaologists, and oral surgeon

IV sedation can be in office – if have certificate for it.

Each state has different.

Time for anterior teeth could be an hour

Posterior tooth could take an hour.

Sometime done in two stages

Anterior – front

Posterior – back teeth molars

Send an invoice

George Gosling – billing dental, CMS -


--

Ryan B. Finkel

Assistant United States Attorney

Southern District of New York

One Saint Andrew's Plaza

New York, NY 10007

(212) 637-6612

Ryan.Finkel@usdoj.gov

CONFIDENTIAL



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG
May 2, 2022

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 2, 2022

To: All Counsel

Re:   *United States v. Williams, et al.* **21 Cr. 603 (VEC)**

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information.

During the course of several proffers, Melvin Ely made the following statements, in substance and in part: (i) Dr. Washington provided a medical consultation on their second phone call; (ii) defendant Terrance Williams used the phone number (310) 717-1420; and (iii) Ely was involved in a "similar scheme" with Keyon Dooling that he thought was on "the up and up."

During the course of several proffers, C.J. Watson made the following statements, in substance and in part: (i) Watson saw Dr. Khaziran in approximately August or September of 2017 for issues with his Achilles heel and his knee.  Watson visited Dr. Khaziran's office in Los Angeles two to three times "at most."  When Watson visited the office, he would meet with Dr. Khaziran's assistant and discuss his issue with Watson's assistant.  Watson would then meet with Dr. Khaziran for approximately 30 to 45 minutes; and (ii) Defendant Alan Anderson told Watson that it was "our money," and that Anderson had been working with Williams.  Anderson told Watson that Williams knew about the Plan's accounts and worked with doctors to get invoices to submit for reimbursement.

During a proffer, Eddie Robinson made the following statements, in substance and in part: Robinson called Dr. Khaziran, and during the call, Robinson asked Dr. Khaziran if he knew defendant Terrence Williams.  Dr. Khaziran stated that Williams was a great guy, was a patient of his, and was having money issues.  Dr. Khaziran knew about the "NBA program," and had helped Williams by giving Williams invoices to submit to the plan for Williams to get reimbursed.  Robinson told Dr. Khaziran that Robinson had $60,000 worth of invoices from Dr. Khaziran's clinic.  Dr. Khaziran then told his secretaries to cancel all his appointments in a frantic and panicked way.  Dr. Khaziran then asked Robinson to email the invoices for him to see for himself.  Dr. Khaziran then said "wow" these are my invoices.

During the course of several proffers, Antoine Wright made the following statements, in substance and in part: (i) Defendant Alan Anderson said we have money in the fund, it is our money – we can't get in trouble – because it is your money.  Initially, Anderson did not say it was illegal.  Wright had asked Anderson whether "they" [the Plan] are going to believe Anderson had

those procedures, and Anderson responded that "everybody is using this money, it is your money and you won't be in trouble." This made Wright feel more comfortable; and (ii) with respect to defendant Glen Davis, Wright believes that Terrence Williams may have taken advantage of Davis. Williams told Wright that Williams called the Plan and talked to the Plan while pretending to be Davis because Davis did not know what to say.

Attorneys for Dr. Patrick Khaziran stated to the Government, in substance and in part, that they believe their client would state the following: (i) Dr. Khaziran initially believed the money on the NBA Players' Plan cards was taken from player's paychecks and reserved for their use after playing. He later learned this impression, that the funds came from the players' paychecks, was mistaken; (ii) certain athletes were in the "VIP plan" at ACRC and/or Sports Rehab LA and for "VIP patients," they could come and go as they please, and there are not always medical records or documentation for each visit; and (iii) ACRC and Sports Rehab LA are not permeated with fraud. Patrick Khaziran is represented by Vince Farhat and Lena Streisand of Jeffer, Mangels, Butler & Mitchell LLP.

On April 20, 2022, an employee of ACRC and Sports Rehab LA testified in the Grand Jury on behalf of ACRC and Sports Rehab LA, and stated the following, in substance and in part: (i) Dr. Khaziran performs home visits for treatment; (ii) after examining KHAZ000271, the witness concluded Ronald Davis was present at ACRC and Sports Rehab L.A. on August 2, 2021 and August 3, 2021; (iii) some athletes pay different prices than non-athlete patients; (iv) athletes listed in KHAZ000006 and KHAZ000273 were charged $1,000 per visit; (v) KHAZ003432 indicates that patient visited ACRC/Sports Rehab LA on November 19, 2018. ACRC and Sports Rehab LA are represented by David Vaughn of Vaughn Law Offices.

In conversations with the Government, an individual identified as CC-1 in the Indictments stated the following, in substance and in part: defendant Terrence Williams knew of a member on the NBA Players' Association Board that approved the invoices a doctor from ACRC submitted for reimbursement. This board member knew that the invoices the doctor from ACRC submitted for reimbursement were fraudulent. CC-1 did not know the name of this person, and CC-1 was not sure whether this person was an actual member of the NBA Players' Association Board. Williams told CC-1 the invoices CC-1 made would get approved because this person was on the board. This person may have had a say in Williams's financial assistance request. This board member also knew the doctor at ACRC before Williams knew of this doctor. Williams told CC-1 this board member engaged in the same scheme with the doctor from ACRC. It was CC-1's

understanding that these invoices were approved by the board member.  CC-1 believed that this board member was a retired NBA player.  CC-1 is represented by Marisa Cabrera of the Federal Defenders of New York.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing.  **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612

Received by GLG
May 20, 2022



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 20, 2022

To: All Counsel

**Re:**   ***United States v. Williams, et al.* 21 Cr. 603 (VEC)**

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information.

During the course of a proffer, C.J. Watson made the following statements, in substance and in part: (i) In August 2019, Watson received a letter that his claim was denied and could be appealed.  That same month, Watson called "Dr. Pat" to ask if he was working with Terrence. "Dr. Pat" said that he was not working with Williams, that he would not risk his medical license, and warned Watson to stay away from Williams. Based on Dr. Pat's quick reaction, tone of voice, and seeming to appreciate that working with Williams could put his medical license at risk despite Watson not providing any other information about the scheme, Watson believed that "Dr. Pat" was not surprised by Watson's call about Williams and may have heard about the invoices scheme before Watson's call; and (ii) Watson knew what Dr. Pat looked like because he had received legitimate treatments from him in the past.

Attorneys for Dr. Patrick Khaziran stated to the Government, in substance and in part, that of the individuals listed on the Government's subpoenas, there is evidence establishing that the following individuals received treatments from Khaziran:  Jordan Crawford, Baron Davis, Daniel Gibson, Darius Morris, Craig Smith, Jeremy Tyler, Quincy Miller, and Dorell Wright.

[continued on the next page]

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing. **This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.**

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Kristy J. Greenberg
Ryan B. Finkel
Assistant United States Attorneys
(212) 637-2469/6612



Received by GLG via ECF
March 31, 2023

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

CDA Note: Per Court
Order, the Government
reproduced this revised
letter on 3/31/23. Please
see Docket Entry 887 for
more information.

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 18, 2022

To: All Counsel

**Re:**   *United States v. Williams et al.*, 21 Cr. 603 (VEC)

Dear Counsel:

*First*, as you know, on August 31, 2022, a Grand Jury returned superseding indictment S7 21 Cr. 603 (VEC). Although the Government had no legal obligation to do so, in response to defense counsel's prior correspondence, *see* 6/9/22 Ltr. From A. Apps to K. Greenberg, at 2-3, during the August 31, 2022 presentation to the Grand Jury, prior to the Grand Jury's vote on S7 21 Cr. 603, a law enforcement witness testified in substance before the Grand Jury that the Plan had informed the case team that it took "no position" on its status as a victim in this case.

*Second*, the Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the below information:

- As previously disclosed in the Government's March 25, 2022 letter, employees at Proflex believed that Terrence Williams called Proflex while assuming the identity of Ronald Glen Davis. The Government has information from several sources that Williams impersonated Davis.

- On or about July 23, 2020, ████████, a Proflex employee, stated to the Government in substance and in part that she believed Milt Palacio was not on the list of individuals the Proflex team had suspicions about. ████████ is represented by ████████ of ████████.

- On or about October 25, 2021, ████████, who submitted claims to the Plan at defendant Glen Davis's request, stated the following, in substance and in part: (i) Williams "was aggressive" with Davis about submissions to the Plan; (ii) Williams was harassing Davis. Davis asked ████ to handle it and Davis told ████ he wanted Williams off his back; (iii) ████ did not think Davis and Williams were working as a team on this. Williams approached Davis with this scheme idea. Davis got caught up in it, but he "bailed on it" when it became too much; and (iv) ████ thought Davis was visiting a physical therapist for services because Davis was injured.

- On or about September 7, 2022, a witness who serves as outside counsel to the Plan and manages the Plan benefits, was interviewed by the Government and the FBI. That witness stated, in substance, that, while in colloquial speech she may sometimes refer to the

06.20.2018

nominal Plan accounts as belonging to the players who have a right to file claims, the money in fact belongs to the Plan and players just have a qualified right to the benefit. The witness is represented by ███████████ and ███████████ .

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing.  This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.


Very truly yours,

DAMIAN WILLIAMS
United States Attorney


by: _____/s/_____
    Ryan B. Finkel
    Daniel G. Nessim
    Assistant United States Attorneys
    (212) 637-2469/2486



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG via ECF
March 31, 2023

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 21, 2023

CDA Note: Per Court
Order, the Government
reproduced this revised
letter on 3/31/23. Please
see Docket Entry 887 for
more information.

**By Email**
Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
646-763-1490
sabrinashroff@gmail.com

Re:  *United States v. Davis*, S7 21 Cr. 603 (VEC)

Dear Counsel:

The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to those obligations and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to inform you that at least two witnesses have described Ronald Glen Davis, in sum and substance, as "not smart" and naïve.  One such witnesses speculated, in sum and substance, that is likely why he became involved in the scheme.

The Government is aware that its obligations under *Brady v. Maryland* and its progeny are ongoing.  This letter is marked "Highly Confidential" under the terms of the Protective Order in this matter.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2469/2486


[Text]

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Received by GLG via ECF
March 31, 2023

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2023

CDA Note: Per Court
Order, the Government
produced this letter on
3/31/23. Please see
Docket Entry 887 for
more information.

**BY ECF**

Hon. Valerie E. Caproni
Thurgood Marshall
United States Courthouse
40 Foley Square, Courtroom 443
New York, NY 10007

   **Re:**  ***United States v. Washington et al.*, S7 21 Cr. 603 (VEC)**

Dear Judge Caproni:

   Pursuant to the Court's March 30, 2023 order, the Government files the enclosed letters.

       Respectfully submitted,

       DAMIAN WILLIAMS
       United States Attorney

    By: /s/
       Ryan B. Finkel
       Daniel G. Nessim
       Assistant United States Attorneys
       (212) 637-6612/2486