# EXHIBIT C

**Elise Caccappolo, PhD, ABPP-CN**
**Board Certified in Clinical Neuropsychology**

Professor of Neuropsychology
Director, Neuropsychology Service
Columbia University Medical Center
New York, NY 10032

December 14, 2022

The Honorable Valerie Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE: United States vs. Ronald Glen Davis, 20-cr-603 (VEC)**

Dear Judge Caproni:

I am a board certified clinical neuropsychologist who examined Mr. Ronald Glen Davis (DOB 01/01/1986) as per the request of his attorney, Sabrina Shroff to perform a neuropsychological evaluation. The purpose of this evaluation was to provide an opinion regarding Mr. Davis's past and present intellectual and cognitive functioning and to offer recommendations regarding appropriate management. In preparation of this report I met with Mr. Davis on 11/01/2022, at which time I administered standardized tests to assess his current level of intellectual functioning. His past and present level of emotional and daily functioning was assessed by this examiner via structured interviewing. Upon directed questioning by this examiner Mr. Davis was polite but demonstrated poor insight overall; therefore, additional information about Mr. Davis's functional abilities was obtained from a telephone interview with his older sister, Toya George on 11/30/22. Finally, I reviewed academic records which consisted of his high school transcript, and media coverage of Mr. Davis's professional and personal activities.

**Confidentiality and Procedures:**
Limits of confidentiality for information discussed in the interview and in the testing were explained to Mr. Davis. He was advised that I had been retained by his attorney to conduct a neuropsychological evaluation and that a report might be prepared. He understood that my evaluation would be protected under attorney client privilege, unless he and his attorney decided to use the report in court, with the exception of a psychiatric emergency (such as suicidal or homicidal plans) or a report of child abuse. He agreed to participate in the evaluation.

1

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

**BACKGROUND HISTORY:**

**Social History:** Glen Davis is a 36-year-old black male who was born and raised in Baton Rouge, Louisiana. He has one sister, Toya Davis, who is ten years older, and another sister, LaJazzia Davis, who is one year younger. Mr. Davis's family dynamic was unsupportive and at times traumatic. He did not meet his father until he was a young adult and ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. His sister Toya often served as his primary caregiver. She described Glen as a "sweet, loving, mama's boy" who was "always nervous." He had a history of encopresis (bedwetting) until age 15.

Mr. Davis' sister noted that from a young age he was unable to perform many activities of daily living independently; subsequently, his sisters (including his younger sister) helped him with activities such as getting dressed and cleaning his room. He was unable to prepare his own meals, perform housekeeping chores, or manage money responsibly. Cognitively, he had difficulty with organization and planning and typically needed instructions broken down for him, not once but several times. He was often unable to remember recently learned information and had difficulty self-monitoring his behavior and emotions. He was bullied by classmates due to his social awkwardness. He did not fight back when bullied and instead, tended to cry when he was confronted with intimidating situations. This has always been the case and as a result he is nicknamed "Big Baby". As he developed, he excelled at sports and the bullying  morphed into merciless teasing and sarcasm.

Academically, Glen struggled in school and required a significant amount of assistance with homework. His sister is unclear as to whether he had a learning disability but stated that he was never a good reader and had difficulty understanding basic concepts that were taught to him in school. A copy of his transcript from LSU Laboratory School in Baton Rouge, LA revealed that he was forced to attend summer school and that he completed two summer school courses due to failing grades before graduating in May of 2004. He attended LSU for three years where he majored in drama. He reported that he was heavily assisted in order to obtain passing scores which were necessary to continue playing basketball. He did not complete his bachelor's degree given that he was drafted by the NBA following his junior year. While many professional athletes manage to eventually complete their bachelor's degrees, Glen never returned to school.

According to his sister Toya, Glen has always been naive and gullible. Toya noted that he has historically allowed himself to be taken advantage of due to his low level of "common sense" as well as a desire to "fit in She noted long-standing difficulty with connecting to his peers, resulting in the absence of friends and strong and healthy friendships. Historically, he did not receive attention from women until he went to college to play basketball. He has had difficulty understanding that many women took advantage of him given his status and income. He has tended to give money to others when solicited without considering the consequences. His functional status has remained exceptionally low, even into adulthood.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

He has difficulty prioritizing, initiating, and following multiple step commands which affects his ability to perform basic tasks such as traveling independently, managing appointments, and managing finances. According to his sister he is unable to comprehend written documents and therefore does not fill out paperwork on his own, insisting instead to have others manage most of his business transactions.

Mr. Davis has been described as "sensitive" by his older sister.  She described a history of emotional hyper-responsiveness and difficulty adapting his behavior to his emotions. The media has described him similarly.  According to a 2006 New York Times profile, he "earned his nickname 'Big Baby' because he was a big kid with a sensitive side. When Davis played Pop Warner football and everyone else on the team was older, he pouted because he was the baby. When he played high school basketball and his team lost, he cried. And when Hurricane Katrina struck in late summer and he held IV's for the victims who found refuge on his home court, he cried again." https://www.nytimes.com/2006/03/29/sports/ncaabasketball/big-baby.html\ Within this same article he is described as always wanting to fit in: "he can seem to be overcompensating, the class clown still looking for acceptance."

**Medical History:**
Medical records were not made available for review, and should they become available, I would be happy to incorporate them. Mr. Davis reported that he currently takes no medications. According to information obtained from various media sources, Mr. Davis sustained a concussion on December 21, 2009 when he was involved in a motor vehicle accident. Details regarding cognitive sequelae associated with the concussion were not available to this examiner. He suffered a second concussion, referred to as "severe" by the media, on May 26, 2010. He was struck in the face by another player, after which he fell to the ground where he remained motionless for a few seconds before attempting to rise to his feet. He stumbled and fell again and appeared dazed once he was standing. Mr. Davis reports that he also suffered memory loss as a result of the concussion.  The Celtics coach Doc Rivers said Davis "blacked out" on the court. The hit also "dislodged at least one of Davis' teeth".https://www.espn.com/boston/nba/news/story?id=5224374

The following day, a satirical article entitled "Glen Davis Actually Becomes Smarter After Concussion" was published online. A false quote included in the article described him as the equivalent of intellectually disabled: "When someone suffers a concussion, he usually experiences a loss of memory and at least temporary loss of intellect," Schmidt explained. "However, I believe that Mr. Davis possessed so little brainpower, that he experienced an increase because it was not possible to suffer a loss of any kind." https://bleacherreport.com/articles/397855-glen-davis-actually-becomes-smarter-after-concussion. While quotes used in the article were false, the fact that Mr. Davis was portrayed as intellectually deficient represents acknowledgement of his low baseline cognitive abilities by his peers.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

**Neuropsychological Test Results:**

**Effort:** Several measures of performance validity were periodically administered across test evaluations to gauge whether effort varied throughout the testing session (Rey 15 Item; TOMM; Reliable Digit Span). Glen's performance on these tests suggested that adequate effort was put forth throughout the evaluation. In addition to Glen's intact performance on embedded and stand-alone validity measures, additional evidence of adequate effort can be assumed given the lack of violations of test difficulty hierarchy, i.e. he did not regularly "fail" easier test items while "passing" more difficult items. Furthermore, there was no significant discrepancy noted between test scores measuring the same underlying construct. In summary, he approached the evaluation in a cooperative and effortful manner, yielding results likely indicative of his current level of cognitive and emotional functioning. There was no clinical or test evidence of suboptimal performance or malingering.

**Intellectual Functioning:** Glen was administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV). The primary subtest scores of the WAIS-IV contribute to the primary index scores, which represent intellectual functioning in four cognitive areas: Verbal Comprehension Index (VCI), Perceptual Reasoning Index (PRI), Working Memory Index (WMI), and Processing Speed Index (PSI.) This assessment provides a Full Scale IQ (FSIQ) composite score that represents general intellectual ability. The primary index scores and FSIQ have a mean of 100 and a standard deviation of 15. Scores ranging from 90-109 are typically considered average.

*Glen's general cognitive ability is within the borderline range of intellectual functioning, as measured by the FSIQ. His overall thinking and reasoning abilities exceed those of only approximately 6% of individuals his age (FSIQ = 77; 95% confidence interval = 73-82).*

Glen may experience difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities. His verbal comprehension and perceptual reasoning abilities are both in the low average range (VCI = 85, PRI = 84).

His ability to sustain attention, concentrate, and exert mental control is in the borderline range when compared to his peers (WMI = 74).

His ability to process simple or routine visual material without making errors is also in the borderline range (PSI = 76). See table below.

**WAIS-IV Index Score Summary**

|  | Standard Scores | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Verbal Comprehension | 85 | 16 | Low Average |
| Perceptual Reasoning | 84 | 14 | Low Average |
| Working Memory | 74 | 4 | Borderline |
| Processing Speed | 76 | 5 | Borderline |
| *Full Scale* | *77* | *6* | *Borderline* |

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

**Executive Functioning:** Executive functions play a role in organizing, directing, managing, and integrating a variety of cognitive abilities in order to reach a goal or produce a more complex level of cognitive functioning. Executive control includes a variety of important high-level skills such as sustaining attention over a period of time and in spite of distraction, organizing one's thoughts and behavior before acting, utilizing feedback in order to succeed in a given task, juggling multiple pieces of information at once (mental flexibility), and using planning and organizational skills when approaching a task.

Glen was administered subtests from the Delis Kaplan Executive Function System (D-KEFS). He demonstrated variable performance on a test of visual-motor set-shifting ability that incorporates four trials of increasingly complex tasks (D-KEFS Trail Making Test). Specifically, he exhibited below average performance on the first trial, which requires speeded visual scanning ability. Following the first trial the examiner re-stated the test instructions given that Glen appeared uncertain of what he was asked to do. On the second trial, his performance improved and he scored in the average range when he was required to sequence numbers in numerical order as well as when sequencing letters in alphabetical order.  When a set-shifting component was added and he was required to alternate between letters and numbers, i.e. connect letters and numbers in sequence, his speed on this subtest again remained in the average range. Glen's performance on this measure reflects his difficulty with understanding test instructions. He was unable to complete the first trial until test instructions were broken down for him and explained in simple terms. The results would be significantly different had he been asked to read the instructions himself and take the test.

Glen demonstrated variable but overall poor performance on a test requiring the ability to inhibit a dominant and automatic verbal response (D-KEFS Color Word Interference Test). He scored in the below average range for speed when asked to name colors aloud as quickly as possible, as well as when instructed to read aloud words quickly. Of note is the observation that he made multiple errors during both trials. His performance declined to the exceptionally low range for speed when required to inhibit a response, with a high number of self-corrected errors. When he was required to inhibit and shift set simultaneously, his speed fell in the below average range and he again made a high number of self-corrected and uncorrected errors suggesting poor self-monitoring.

Glen was administered a test of problem-solving strategy in which he was instructed to ask the fewest yes/no questions as possible in order to identify an unknown target object from an array of 30 line drawings. The items belong to a number of categories and subcategories that exist in a hierarchical, semantic structure (D-KEFS Twenty Questions Test).  Glen's overall score on this measure fell in the below average range. He tended to use ineffective categorization strategies, for example, relying exclusively on questions that referred to single items.

Overall, Glen demonstrated impaired executive functioning. Specifically, he demonstrated a lack of abstract thinking, i.e. difficulty disregarding concrete meaning and understanding

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

figurative meaning.  He also exhibited cognitive rigidity, performing poorly on tests requiring flexible thinking and cognitive switching.  He demonstrated a lack of planning in order to arrive at the most direct solution when faced with a problem, as well as weak skills when integrating information.  Qualitative data from the evaluation revealed poor language comprehension and difficulty understanding both simple and complex speech.  He was unable to appreciate sarcasm or nuances.  His history of difficulty with emotional regulation is consistent with his executive function deficits, as executive dysfunction often manifests as an inability to self-soothe psychologic arousal induced by strong emotions.

**Summary:**
Glen's current WAIS-IV performance fulfills criteria for a diagnosis of an Intellectual Disability (previously referred to as mental retardation), which is defined as a neurodevelopmental disorder that is characterized by intellectual deficits, i.e., reasoning, abstract thinking, learning, both experiential and academic) as well as difficulties in conceptual, social, and practical areas of living (Diagnostic and Statistical Manual of Mental Disorders-5th edition).  The level and severity of an intellectual disability is defined on the basis of adaptive skills rather than an IQ score alone. Adaptive behavior refers to the skills learned and performed to meet society's demands and consists of three broad domains: conceptual, social and practical adaptive skills. Conceptual skills are defined by communication skills, functional academics, and self-direction. Social skills are defined by such abilities as interpersonal skills, social responsibility, following rules, and self-esteem.  Higher order social skills have also been identified to include elements such as gullibility, naivete and avoiding victimization. Practical skills consist of basic personal care skills such as hygiene, domestic skills, health and safety as well as work skills.   The assessment of one's adaptive skills is different from the assessment of intellectual functioning in that adaptive behavior is what a person does and not what he or she can do or could do.

Based on reported interactions with his family, the mitigation specialist and his current and prior counsel, Mr. Davis' functioning has interfered with their ability to work with him. Reports from his sister, attorneys and mitigation specialist in regard to Glen's inability to function independently are consistent with his low level of intellectual functioning. Glen's need for a significant level of support to achieve optimal independence suggests a *moderately severe intellectual disability*. The etiology of Glen's low level of intellectual functioning is unknown. The most common causes of borderline impaired intellectual ability include genetic conditions, problems during pregnancy that impact brain development such as drug and alcohol use, labor and delivery problems such as not getting enough oxygen at birth, or injuries such as head trauma.                                                 Mr. Davis has sustained at least two head injuries in 2009 and 2010, the second with known loss of consciousness which likely exacerbated his intellectual difficulties.  While we are aware of two significant head injuries, the fact that he has participated in contact sports since a very young age increases the likelihood that he suffered previous minor head injuries.

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION: Davis, Glen

Cognitive testing revealed impaired performance on formal executive measures assessing higher-level skills that localize to the prefrontal cortex. Individuals with full-scale IQ scores in the borderline impaired range and significant executive dysfunction tend to be slower in all areas of conceptual development and social and daily living skills. Poor executive functioning can also manifest as difficulty with self-modulation of emotions. Glen has been able to learn practical life skills which has allowed him to function in ordinary life with support; however, he is unable to function at more advanced levels independently.

Given his extremely low level of intellectual and cognitive functioning, Glen does not have the ability to knowingly engage and/or maintain a role such as that of which he is accused, as it was explained to me. He would not be able to read a form and fill it out accurately. He lacks basic conceptual skills such as effective language, reading and writing, math/money concepts, and self-direction. While he is able to follow simple instructions, he lacks higher-order executive function skills. Subsequently he would be unable to perform tasks associated with the activities he is accused of, such as submitting false paperwork or invoices. Anecdotally, I note that Mr. Davis is incapable of making a simple appointment or travel arrangements. He is simply unable to plan and execute an itinerary.

Furthermore, he has a high level of naiveté that can lead him to be victimized. He has no history of antisocial behavior or personality disordered behaviors and deceit and manipulation have not been central features of his personality. Society would be better served by providing Glen with a program of therapeutic support that helps him to understand his personal strengths and recognize the consequences of his actions so as to assist him with the goal of developing resiliency and positive coping skills. If desired, referrals can be made for professionals who would best be able to assist with these types of treatment.

Please do not hesitate to contact me if you have questions regarding this report or if I may be of any further assistance.

Respectfully submitted,

Elise Caccappolo, PhD, ABPP-CN
Board Certified Clinical Neuropsychologist
Professor of Neuropsychology
Director, Neuropsychology Service
Columbia University Medical Center
NY License #014270